# WITHROW ET AL. *v.* LARKIN

No. 73-1573.   Argued December 18, 1974—Decided April 16, 1975

WHITE, J., delivered the opinion for a unanimous Court.

*Betty R. Brown,* Solicitor General of Wisconsin, argued the cause for appellants. With her on the brief were *Robert W. Warren,* Attorney General, and *LeRoy L. Dalton,* Assistant Attorney General.

*Robert H. Friebert* argued the cause and filed a brief for appellee.

MR. JUSTICE WHITE delivered the opinion of the Court.

The statutes of the State of Wisconsin forbid the practice of medicine without a license from an Examining Board composed of practicing physicians. The statutes also define and forbid various acts of professional misconduct, proscribe fee splitting, and make illegal the practice of medicine under any name other than the name under which a license has issued if the public would be misled, such practice would constitute unfair competition with another physician, or other detriment to the profession would result. To enforce these provisions, the Examining Board is empowered under Wis. Stat. Ann. §§ 448.17 and 448.18 (1974) to warn and reprimand, temporarily to suspend the license, and "to institute criminal action or action to revoke license when it finds probable cause therefor under criminal or revocation statute . . . ." [1] When an investigative proceeding before the

[1] "No person shall practice or attempt or hold himself out as authorized to practice medicine, surgery, or osteopathy, or any other system of treating the sick as the term 'treat the sick' is defined in s. 445.01 (1) (a), without a license or certificate of registration from

Examining Board was commenced against him, appellee brought this suit against appellants, the individual members of the Board, seeking an injunction against the enforcement of the statutes. The District Court issued a preliminary injunction, the appellants appealed, and we noted probable jurisdiction, 417 U. S. 943 (1974).

I

Appellee, a resident of Michigan and licensed to practice medicine there, obtained a Wisconsin license in August 1971 under a reciprocity agreement between Michigan and Wisconsin governing medical licensing. His practice in Wisconsin consisted of performing abor-

the examining board, except as otherwise specifically provided by statute." Wis. Stat. Ann. § 448.02 (1).

"The examining board shall investigate, hear and act upon practices by persons licensed to practice medicine and surgery under s. 488.06, that are inimical to the public health. The examining board shall have the power to warn and to reprimand, when it finds such practice, and to institute criminal action or action to revoke license when it finds probable cause therefor under criminal or revocation statute, and the attorney general may aid the district attorney in the prosecution thereof." § 448.17.

"A license or certificate of registration may be temporarily suspended by the examining board, without formal proceedings, and its holder placed on probation for a period not to exceed 3 months where he is known or the examining board has good cause to believe that such holder has violated sub. (1). The examining board shall not have authority to suspend a license or certificate of registration, or to place a holder on probation, for more than 2 consecutive 3-month periods. All examining board actions under this subsection shall be subject to review under ch. 227." § 448.18 (7).

Section 448.18 (1)(g) prohibits "engaging in conduct unbecoming a person licensed to practice or detrimental to the best interests of the public." Fee splitting is proscribed by § 448.23 (1). Section 448.02 (4) regulates the use of a name by a physician in his practice other than the name under which he was licensed.

Appellee maintains that he has legal and factual defenses to all charges made against him. Brief for Appellee 28–29, n. 13.

tions at an office in Milwaukee. On June 20, 1973, the Board sent to appellee a notice that it would hold an investigative hearing on July 12, 1973, under Wis. Stat. Ann. § 448.17 to determine whether he had engaged in certain proscribed acts.[2] The hearing would be closed to the public, although appellee and his attorney could attend. They would not, however, be permitted to cross-examine witnesses. Based upon the evidence presented at the hearing, the Board would decide "whether to warn or reprimand if it finds such practice and whether to institute criminal action or action to revoke license if probable cause therefor exists under criminal or revocation statutes." App. 14.

On July 6, 1973, appellee filed his complaint in this action under 42 U. S. C. § 1983 seeking preliminary and permanent injunctive relief and a temporary restraining order preventing the Board from investigating him and from conducting the investigative hearing. The District Court denied the motion for a temporary restraining order.

On July 12, 1973, appellants moved to dismiss the complaint. On the same day, appellee filed an amended complaint in which injunctive relief was sought on the ground that Wis. Stat. Ann. §§ 448.17 and 448.18 were unconstitutional and that appellants' acts with respect to him violated his constitutional rights. The District Court again denied appellee's motion for a temporary restraining order, but did not act upon appellants' motion to dismiss. On July 30, 1973, appellants submitted an amended motion to dismiss.

---

[2] The notice indicated that the hearing would be held "to determine whether the licensee has engaged in practices that are inimical to the public health, whether he has engaged in conduct unbecoming a person licensed to practice medicine, and whether he has engaged in conduct detrimental to the best interests of the public." App. 14.

The Board proceeded with its investigative hearing on July 12 and 13, 1973; numerous witnesses testified and appellee's counsel was present throughout the proceedings. Appellee's counsel was subsequently informed that appellee could, if he wished, appear before the Board to explain any of the evidence which had been presented. App. 36–37.

On September 18, 1973, the Board sent to appellee a notice that a "contested hearing"[3] would be held on October 4, 1973, to determine whether appellee had engaged in certain prohibited acts[4] and that based upon

---

[3] Apart from his claim that the tribunal at the contested hearing would be biased, appellee has not contended that that hearing would not be a full adversary proceeding. See Wis. Stat. Ann. §§ 227.07–227.21. See also *Daly* v. *Natural Resources Board,* 60 Wis. 2d 208, 218, 208 N. W. 2d 839, 844 (1973), cert. denied, 414 U. S. 1137 (1974); *Margoles* v. *State Board of Medical Examiners,* 47 Wis. 2d 499, 508–511, 177 N. W. 2d 353, 358–359 (1970). No issue has been raised concerning the circumstances, if any, in which the Board could suspend a license without first holding an adversary hearing.

[4] The notice stated that the hearing would be held "to determine whether the licensee has practiced medicine in the State of Wisconsin under any other Christian or given name or any other surname than that under which he was originally licensed or registered to practice medicine in this state, which practicing has operated to unfairly compete with another practitioner, to mislead the public as to identity, or to otherwise result in detriment to the profession or the public, and more particularly, whether the said Duane Larkin, M. D., has practiced medicine in this state since September 1, 1971, under the name of Glen Johnson." It would also "determine whether the licensee has permitted persons to practice medicine in this state in violation of sec. 448.02 (1), Stats., more particularly whether the said Duane Larkin, M. D., permitted Young Wahn Ahn, M. D., an unlicensed physician, to perform abortions at his abortion clinic during the year 1972." Finally the Board would "determine whether the said Duane Larkin, M. D., split fees with other persons during the years 1971, 1972, and 1973 in violation of sec. 448.23 (1)." App. 45–46.

the evidence adduced at the hearing the Board would determine whether his license would be suspended temporarily under Wis. Stat. Ann. § 448.18 (7). Appellee moved for a restraining order against the contested hearing. The District Court granted the motion on October 1, 1973. Because the Board had moved from purely investigative proceedings to a hearing aimed at deciding whether suspension of appellee's license was appropriate, the District Court concluded that a substantial federal question had arisen, namely, whether the authority given to appellants both "to investigate physicians and present charges [and] to rule on those charges and impose punishment, at least to the extent of reprimanding or temporarily suspending" violated appellee's due process rights. Appellee's motion to request the convening of a three-judge court was also granted, and appellants' motion to dismiss was denied. 368 F. Supp. 793, 795–796 (ED Wis. 1973).

The Board complied and did not go forward with the contested hearing. Instead, it noticed and held a final investigative session on October 4, 1973, at which appellee's attorney, but not appellee, appeared.[5] The Board thereupon issued "Findings of Fact," "Conclusions of Law," and a "Decision" in which the Board found that appellee had engaged in specified conduct proscribed by the statute. The operative portion of its "Decision" was the following:

"Within the meaning of sec. 448.17, Stats., it is hereby determined that there is probable cause to believe that licensee has violated the criminal provisions of ch. 448, Stats., and that there is probable cause for an action to revoke the license of the licensee for engaging in unprofessional conduct.

---

[5] Appellee unsuccessfully sought a temporary restraining order against this hearing. See Record on Appeal, Entry 21.

"Therefore, it is the decision of this Board that the secretary verify this document and file it as a verified complaint with the District Attorney of Milwaukee County in accordance with sec. 448.18 (2), Stats., for the purpose of initiating an action to revoke the license of Duane R. Larkin, M. D., to practice medicine and surgery in the State of Wisconsin and initiating appropriate actions for violation of the criminal laws relating to the practice of medicine." App. 59–60.

On November 19, 1973, the three-judge District Court found (with an opinion following on December 21, 1973) that § 448.18 (7) was unconstitutional as a violation of due process guarantees and enjoined the Board from enforcing it. Its holding was:

"[F]or the board temporarily to suspend Dr. Larkin's license at its own contested hearing on charges evolving from its own investigation would constitute a denial to him of his rights to procedural due process. Insofar as § 448.18 (7) authorizes a procedure wherein a physician stands to lose his liberty or property, absent the intervention of an independent, neutral and detached decision maker, we concluded that it was unconstitutional and unenforceable." 368 F. Supp. 796, 797 (ED Wis. 1973).

Judgment was entered on January 31, 1974, by which it was "Ordered and Adjudged that § 448.18 (7), Wis. Stats., is unconstitutional and that the defendants are preliminarily enjoined until further notice from utilizing the provisions of § 448.18 (7), Wis. Stats."

Appellants took an appeal from that decision, and we noted probable jurisdiction on June 10, 1974. Subsequently, on July 25, 1974, the District Court, at the initial suggestion of appellants but joined in by a cross-motion of appellee, modified its judgment so as to with-

draw its declaration of unconstitutionality and to enjoin the enforcement of § 448.18 (7) against appellee only. The amended judgment declared that appellee would suffer irreparable injury if the statute were applied to him and that his challenge to the statute's constitutionality had a high likelihood of success.[6]

## II

Appellants correctly assert that the District Court's initial judgment conflicted with this Court's holding in *Mayo* v. *Lakeland Highlands Canning Co.*, 309 U. S. 310 (1940), that a state statute should not be declared unconstitutional by a district court if a preliminary injunction is granted a plaintiff to protect his interests during the ensuing litigation. "The question before [the District Court] was not whether the act was constitutional or unconstitutional . . . but was whether the showing made raised serious questions, under the federal Constitution . . . and disclosed that enforcement of the act, pending final hearing, would inflict irreparable damages upon the complainants." *Id.*, at 316. The January 31, 1974, judgment should not have declared § 448.18 (7) unconstitutional and it erroneously enjoined the Board from utilizing the section against any licensee.

The District Court, however, has subsequently modified its judgment to eliminate the declaration of uncon-

---

[6] The modified judgment reads as follows:

"IT IS ORDERED AND ADJUDGED that the defendants are preliminarily enjoined until further notice from utilizing the provisions of § 448.18 (7), Wis. Stats., against the plaintiff, Duane Larkin, M. D., on the grounds that the plaintiff would suffer irreparable injury if said statute were to be applied against him, and that the plaintiff's challenge to the constitutionality of said statute has a high likelihood of success." Suggestion of Mootness or in the Alternative Motion to Reconsider Appellee's Motion to Dismiss or Affirm 21–22.

stitutionality and to enjoin application of the statute only as against appellee.[7]   Since appellants are no longer forbidden to apply the statutes to other persons, this issue in the case has been effectively settled.

We have also concluded that the amended judgment makes inappropriate extended treatment of appellants' contentions that the District Court failed to make the findings and conclusions required by Fed. Rule Civ. Proc. 52 (a), and failed to include in the order granting the injunction the reasons for its issuance as required by Rule 65 (d).[8]   The District Court's

---

[7] See n. 6, *supra*.

[8] Appellants contend in addition that appellee's motion for a temporary restraining order and injunctive relief did not state with particularity the grounds for such relief as required by Fed. Rule Civ. Proc. 7 (b), and that the motion went beyond the subject matter of the action since the amended complaint challenged only the conducting of the *ex parte* investigative hearing by the Board. Our review of the record leads us to the conclusion that whatever deficiencies appellee's motion might have had, they are insufficient to require reversal of the District Court decision giving injunctive relief.   We also find that the motion was within the subject matter of the case as defined by the amended complaint.   See App. 23.

Appellants also contend that appellee offered *no* evidence upon which injunctive relief could be based.   This case, however, turns upon questions of law and not upon complicated factual issues, and the District Court has found both that appellee's challenge to § 448.18 (7) has a high likelihood of success on the merits and that appellee would be irreparably injured absent injunctive relief.   If the District Court is correct in its constitutional premise that an agency which has investigated possible offenses cannot fairly adjudicate the legal and factual issues involved, then its conclusion that appellee would suffer irreparable injury by having his license temporarily suspended by such an agency is not irrational, and we will not disturb it.   Cf. *Gibson* v. *Berryhill*, 411 U. S. 564, 577 n. 16 (1973).

Finally, we do not agree with appellants' contention that the District Court should have entirely refrained from deciding the merits of this case and from interfering with the state administrative proceeding.   *Id.*, at 575–577.

opinion and initial judgment were deficient in this respect, but its amended judgment found what the court said was contained in its prior opinion [9]—that appellee would suffer irreparable injury if the statute were to be applied against him and that appellee's "challenge to the constitutionality of said statute has a high likelihood of success." [10]   Cf. *Brown* v. *Chote,* 411 U. S. 452, 456 (1973).   While a decision to vacate and remand for fuller emendation of the findings, conclusions, and judgment would be justified in view of their lack of specificity,[11] we doubt that such action, in the circumstances present here, would add anything essential to the determination of the merits.   The District Court's decision turned upon the sequence of functions followed by appellants and not upon any factual issue peculiar to this case. We have jurisdiction under 28 U. S. C. § 1253,[12] and a

---

[9] "In addition, the plaintiff requests that the modified judgment should recite specific grounds not previously included in the judgment but contained in the earlier memorandum decision of this court. . . . We conclude that the plaintiff's position is well taken." Suggestion of Mootness or in the Alternative Motion to Reconsider Appellee's Motion to Dismiss or Affirm 19.

[10] See n. 6, *supra.*

[11] See *Schmidt* v. *Lessard,* 414 U. S. 473, 476–477 (1974); *Gunn* v. *University Committee,* 399 U. S. 383, 388–389 (1970).

[12] "Except as otherwise provided by law, any party may appeal to the Supreme Court from an order granting or denying, after notice and hearing, an interlocutory or permanent injunction in any civil action, suit or proceeding required by any Act of Congress to be heard and determined by a district court of three judges."

Under 28 U. S. C. §§ 2281 and 2284, a three-judge district court is required for entering a preliminary or permanent injunction against the enforcement of a state statute on the grounds of the unconstitutionality of the law.   That requirement includes preliminary injunctions against enforcement of state statutes based on "a high likelihood of success" of the constitutional challenge to the statutes. See *Brown* v. *Chote,* 411 U. S. 452 (1973); *Goldstein* v. *Cox,* 396. U. S. 471 (1970); *Mayo* v. *Lakeland Highlands Canning Co.,* 309 U. S. 310 (1940).

remand at this juncture would be a costly procedure to emphasize points that have already been made and recognized by both parties as well as by the District Court.

## III

The District Court framed the constitutional issue, which it addressed as being whether "for the board temporarily to suspend Dr. Larkin's license at its own contested hearing on charges evolving from its own investigation would constitute a denial to him of his rights to procedural due process." 368 F. Supp., at 797.[13] The question was initially answered affirmatively, and in its amended judgment the court asserted that there was a high probability that appellee would prevail on the question. Its opinion stated that the "state medical examining board [did] not qualify as [an independent] decisionmaker [and could not] properly rule with regard to the merits of the same charges it investigated and, as in this case, presented to the district attorney." *Id.,* at 798. We disagree. On the present record, it is quite unlikely that appellee would ultimately prevail on the merits of the due process issue presented to the District Court, and it was an abuse of discretion to issue the preliminary injunction.

Concededly, a "fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison,* 349 U. S. 133, 136 (1955). This applies to administrative agencies which adjudicate as well as to courts. *Gibson* v. *Berry-*

---

[13] After the District Court made its decision, the Board altered its procedures. It now assigns each new case to one of the members for investigation, and the remainder of the Board has no contact with the investigative process. Affidavit of John W. Rupel, M. D., Suggestion of Mootness or in the Alternative Motion to Reconsider Appellee's Motion to Dismiss or Affirm 7. That change, designed to accommodate the Board's procedures to the District Court's decision, does not affect this case.

*hill,* 411 U. S. 564, 579 (1973). Not only is a biased decisionmaker constitutionally unacceptable but "our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison, supra,* at 136; cf. *Tumey* v. *Ohio,* 273 U. S. 510, 532 (1927). In pursuit of this end, various situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable. Among these cases are those in which the adjudicator has a pecuniary interest in the outcome [14] and in which he has been the target of personal abuse or criticism from the party before him.[15]

The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

Very similar claims have been squarely rejected in prior decisions of this Court. In *FTC* v. *Cement Institute,* 333 U. S. 683 (1948), the Federal Trade Com-

---

[14] *Gibson* v. *Berryhill,* 411 U. S., at 579; *Ward* v. *Village of Monroeville,* 409 U. S. 57 (1972); *Tumey* v. *Ohio,* 273 U. S. 510 (1927). Cf. *Commonwealth Coatings Corp.* v. *Continental Casualty Co.,* 393 U. S. 145 (1968).

[15] *Taylor* v. *Hayes,* 418 U. S. 488, 501–503 (1974); *Mayberry* v. *Pennsylvania,* 400 U. S. 455 (1971); *Pickering* v. *Board of Education,* 391 U. S. 563, 578–579, n. 2 (1968). Cf. *Ungar* v. *Sarafite,* 376 U. S. 575, 584 (1964).

48

mission had instituted proceedings concerning the respondents' multiple basing-point delivered-price system. It was demanded that the Commission members disqualify themselves because long before the Commission had filed its complaint it had investigated the parties and reported to Congress and to the President, and its members had testified before congressional committees concerning the legality of such a pricing system. At least some of the members had disclosed their opinion that the system was illegal. The issue of bias was brought here and confronted "on the assumption that such an opinion had been formed by the entire membership of the Commission as a result of its prior official investigations." *Id.,* at 700.

The Court rejected the claim, saying:

> "[T]he fact that the Commission had entertained such views as the result of its prior *ex parte* investigations did not necessarily mean that the minds of its members were irrevocably closed on the subject of the respondents' basing point practices. Here, in contrast to the Commission's investigations, members of the cement industry were legally authorized participants in the hearings. They produced evidence—volumes of it. They were free to point out to the Commission by testimony, by cross-examination of witnesses, and by arguments, conditions of the trade practices under attack which they thought kept these practices within the range of legally permissible business activities." *Id.,* at 701.

In specific response to a due process argument, the Court asserted:

> "No decision of this Court would require us to hold that it would be a violation of procedural due process for a judge to sit in a case after he had ex-

pressed an opinion as to whether certain types of conduct were prohibited by law. In fact, judges frequently try the same case more than once and decide identical issues each time, although these issues involve questions both of law and fact. Certainly, the Federal Trade Commission cannot possibly be under stronger constitutional compulsions in this respect than a court." *Id.*, at 702–703 (footnote omitted).

This Court has also ruled that a hearing examiner who has recommended findings of fact after rejecting certain evidence as not being probative was not disqualified to preside at further hearings that were required when reviewing courts held that the evidence had been erroneously excluded. *NLRB* v. *Donnelly Garment Co.*, 330 U. S. 219, 236–237 (1947). The Court of Appeals had decided that the examiner should not again sit because it would be unfair to require the parties to try "issues of fact to those who may have prejudged them . . . ." 151 F. 2d 854, 870 (CA8 1945). But this Court unanimously reversed, saying:

"Certainly it is not the rule of judicial administration that, statutory requirements apart . . . a judge is disqualified from sitting in a retrial because he was reversed on earlier rulings. We find no warrant for imposing upon administrative agencies a stiffer rule, whereby examiners would be disentitled to sit because they ruled strongly against a party in the first hearing." 330 U. S., at 236–237.

More recently we have sustained against due process objection a system in which a Social Security examiner has responsibility for developing the facts and making a decision as to disability claims, and observed that the challenge to this combination of functions "assumes too much and would bring down too many procedures de-

signed, and working well, for a governmental structure of great and growing complexity." *Richardson* v. *Perales,* 402 U. S. 389, 410 (1971).[16]

[16] The decisions of the Courts of Appeals touching upon this question of bias arising from a combination of functions are also instructive. In *Pangburn* v. *CAB,* 311 F. 2d 349 (CA1 1962), the Civil Aeronautics Board had the responsibility of making an accident report and also reviewing the decision of a trial examiner that the pilot involved in the accident should have his airline transport pilot rating suspended. The pilot claimed that his right to procedural due process had been violated by the fact that the Board was not an impartial tribunal in deciding his appeal from the trial examiner's decision since it had previously issued its accident report finding pilot error to be the probable cause of the crash. The Court of Appeals found the Board's procedures to be constitutionally permissible:

"[W]e cannot say that the mere fact that a tribunal has had contact with a particular factual complex in a prior hearing, or indeed has taken a public position on the facts, is enough to place that tribunal under a constitutional inhibition to pass upon the facts in a subsequent hearing. We believe that more is required. Particularly is this so in the instant case where the Board's prior contact with the case resulted from its following the Congressional mandate to investigate and report the probable cause of all civil air accidents." *Id.,* at 358.

See also *Duffield* v. *Charleston Area Medical Center, Inc.,* 503 F. 2d 512 (CA4 1974); *Kennecott Copper Corp.* v. *FTC,* 467 F. 2d 67, 79–80 (CA10 1972), cert. denied, 416 U. S. 909 (1974); *Intercontinental Industries* v. *American Stock Exchange,* 452 F. 2d 935 (CA5 1971), cert. denied, 409 U. S. 842 (1972); *FTC* v. *Cinderella Career & Finishing Schools, Inc.,* 131 U. S. App. D. C. 331, 338, 404 F. 2d 1308, 1315 (1968); *Skelly Oil Co.* v. *FPC,* 375 F. 2d 6, 17–18 (CA10 1967), modified on other grounds *sub nom. Permian Basin Area Rate Cases,* 390 U. S. 747 (1968); *Safeway Stores, Inc.* v. *FTC,* 366 F. 2d 795, 801–802 (CA9 1966), cert. denied, 386 U. S. 932 (1967); *R. A. Holman & Co.* v. *SEC,* 366 F. 2d 446, 452–453 (CA2 1966), cert. denied, 389 U. S. 991 (1967); *SEC* v. *R. A. Holman & Co.,* 116 U. S. App. D. C. 279, 323 F. 2d 284, cert. denied, 375 U. S. 943 (1963).

Those cases in which due process violations have been found are characterized by factors not present in the record before us in this litigation, and we need not pass upon their validity. In

That is not to say that there is nothing to the argument that those who have investigated should not then adjudicate. The issue is substantial, it is not new, and legislators and others concerned with the operations of administrative agencies have given much attention to whether and to what extent distinctive administrative functions should be performed by the same persons. No single answer has been reached. Indeed, the growth, variety, and complexity of the administrative processes have made any one solution highly unlikely. Within the Federal Government itself, Congress has addressed the issue in several different ways, providing for varying degrees of

*American Cyanimid Co.* v. *FTC,* 363 F. 2d 757 (CA6 1966), one of the commissioners had previously served actively as counsel for a Senate subcommittee investigating many of the same facts and issues before the Federal Trade Commission for consideration. In *Texaco, Inc.* v. *FTC,* 118 U. S. App. D. C. 366, 336 F. 2d 754 (1964), vacated on other grounds, 381 U. S. 739 (1965), the court found that a speech made by a commissioner clearly indicated that he had already to some extent reached a decision as to matters pending before that Commission. See also *Cinderella Career & Finishing Schools, Inc.* v. *FTC,* 138 U. S. App. D. C. 152, 158–161, 425 F. 2d 583, 589–592 (1970). *Amos Treat & Co.* v. *SEC,* 113 U. S. App. D. C. 100, 306 F. 2d 260 (1962), presented a situation in which one of the members of the Securities and Exchange Commission had previously participated as an employee in the investigation of charges pending before the Commission. In *Trans World Airlines* v. *CAB,* 102 U. S. App. D. C. 391, 254 F. 2d 90 (1958), a Civil Aeronautics Board member had signed a brief in behalf of one of the parties in the proceedings prior to assuming membership on the Board. See also *King* v. *Caesar Rodney School District,* 380 F. Supp. 1112 (Del. 1974).

For state-court decisions dealing with issues similar to those involved in this case, see *Koelling* v. *Board of Trustees,* 259 Iowa 1185, 146 N. W. 2d 284 (1966); *State* v. *Board of Medical Examiners,* 135 Mont. 381, 339 P. 2d 981 (1959); *Board of Medical Examiners* v. *Steward,* 203 Md. 574, 102 A. 2d 248 (1954). See also *LeBow* v. *Optometry Examining Board,* 52 Wis. 2d 569, 575, 191 N. W. 2d 47, 50 (1971); *Kachian* v. *Optometry Examining Board,* 44 Wis. 2d 1, 13, 170 N. W. 2d 743, 749 (1969).

separation from complete separation of functions to virtually none at all.[17]   For the generality of agencies, Congress has been content with § 5 of the Administrative Procedure Act, 5 U. S. C. § 554 (d), which provides that no employee engaged in investigating or prosecuting may also participate or advise in the adjudicating function, but which also expressly exempts from this prohibition "the agency or a member or members of the body comprising the agency." [18]

It is not surprising, therefore, to find that "[t]he case law, both federal and state, generally rejects the idea that the combination [of] judging [and] investigating functions is a denial of due process . . . ."   2 K. Davis, Administrative Law Treatise § 13.02, p. 175 (1958).   Similarly, our cases, although they reflect the substance of the problem, offer no support for the bald proposition applied in this case by the District Court that agency members who participate in an investigation are disqualified from adjudicating.   The incredible variety of administrative mechanisms in this country will not yield to any single organizing principle.

---

[17] See 2 K. Davis, Administrative Law Treatise § 13.04 (1958); K. Davis, Administrative Law Treatise § 11.14 (1970 Supp.).

[18] The statute provides in pertinent part:

"An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings. This subsection does not apply—

"(A) in determining applications for initial licenses;

"(B) to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers; or

"(C) to the agency or a member or members of the body comprising the agency."

See also 2 K. Davis, supra, §§ 13.06–13.07.

Appellee relies heavily on *In re Murchison, supra,* in which a state judge, empowered under state law to sit as a "one-man grand jury" and to compel witnesses to testify before him in secret about possible crimes, charged two such witnesses with criminal contempt, one for perjury and the other for refusing to answer certain questions, and then himself tried and convicted them. This Court found the procedure to be a denial of due process of law not only because the judge in effect became part of the prosecution and assumed an adversary position, but also because as a judge, passing on guilt or innocence, he very likely relied on "his own personal knowledge and impression of what had occurred in the grand jury room," an impression that "could not be tested by adequate cross-examination." 349 U. S., at 138.[19]

Plainly enough, *Murchison* has not been understood to stand for the broad rule that the members of an administrative agency may not investigate the facts, institute proceedings, and then make the necessary adjudications. The Court did not purport to question the *Cement Institute* case, *supra,* or the Administrative Procedure Act and did not lay down any general principle that a judge before whom an alleged contempt is committed may not bring and preside over the ensuing contempt proceedings. The accepted rule is to the con-

---

[19] Appellee also relies upon statements made by the Court in *Pickering* v. *Board of Education,* 391 U. S., at 578–579, n. 2. In that case, however, unlike the present one, "the trier of fact was the same body that was also both the victim of appellant's statements and the prosecutor that brought the charges aimed at securing his dismissal." *Ibid.* In any event, the Court did not analyze the question raised by this case because the appellant in *Pickering* had not raised a due process contention in the state proceedings.

The question of the constitutionality of combining in one agency both investigative and adjudicative functions in the same proceeding was raised but did not require answering in *Gibson* v. *Berryhill,* 411 U. S., at 579 n. 17.

trary. *Ungar* v. *Sarafite,* 376 U. S. 575, 584–585 (1964) ;
*Nilva* v. *United States,* 352 U. S. 385, 395–396 (1957).

Nor is there anything in this case that comes within
the strictures of *Murchison.*[20]   When the Board insti-
tuted its investigative procedures, it stated only that
it would investigate whether proscribed conduct had
occurred.   Later in noticing the adversary hearing, it
asserted only that it would determine if violations had
been committed which would warrant suspension of
appellee's license.   Without doubt, the Board then antic-
ipated that the proceeding would eventuate in an
adjudication of the issue; but there was no more evi-
dence of bias or the risk of bias or prejudgment than
inhered in the very fact that the Board had investigated
and would now adjudicate.[21]   Of course, we should be
alert to the possibilities of bias that may lurk in the
way particular procedures actually work in practice.
The processes utilized by the Board, however, do not in
themselves contain an unacceptable risk of bias.   The

---

[20] It is asserted by appellants, Brief for Appellants 25 n. 9, and
not denied by appellee that an agency employee performed the ac-
tual investigation and gathering of evidence in this case and that an
assistant attorney general then presented the evidence to the Board
at the investigative hearings.   While not essential to our decision
upholding the constitutionality of the Board's sequence of functions,
these facts, if true, show that the Board had organized itself in-
ternally to minimize the risks arising from combining investigation
and adjudication, including the possibility of Board members relying
at later suspension hearings upon evidence not then fully subject to
effective confrontation.

[21] Appellee does claim that state officials harassed him with liti-
gation because he performed abortions.   Brief for Appellee 8–9.
He also has complained "about the notoriety of his case during the
'secret' [Board] proceedings." *Id.,* at 20 n. 8.   The District Court
made no findings with respect to these allegations, and the record
does not provide a basis for finding as an initial matter here that
there was evidence of actual bias or prejudgment on the part of
appellants.

investigative proceeding had been closed to the public, but appellee and his counsel were permitted to be present throughout; counsel actually attended the hearings and knew the facts presented to the Board.[22]  No specific foundation has been presented for suspecting that the Board had been prejudiced by its investigation or would be disabled from hearing and deciding on the basis of the evidence to be presented at the contested hearing. The mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the Board members at a later adversary hearing.  Without a showing to the contrary, state administrators "are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances."  *United States* v. *Morgan,* 313 U. S. 409, 421 (1941).

We are of the view, therefore, that the District Court was in error when it entered the restraining order against the Board's contested hearing and when it granted the preliminary injunction based on the untenable view that it would be unconstitutional for the Board to suspend appellee's license "at its own contested hearing on charges evolving from its own investigation . . . ."  The contested hearing should have been permitted to proceed.

## IV

Nor do we think the situation substantially different because the Board, when it was prevented from going forward with the contested hearing, proceeded to make and issue formal findings of fact and conclusions of law asserting that there was probable cause to believe that

---

[22] After the initial investigative hearing, appellee was also given the opportunity to appear before the Board to "explain" the evidence that had been presented to it.  App. 37.

56

appellee had engaged in various acts prohibited by the Wisconsin statutes.[23] These findings and conclusions were verified and filed with the district attorney for the purpose of initiating revocation and criminal proceedings. Although the District Court did not emphasize this aspect of the case before it, appellee stresses it in attempting to show prejudice and prejudgment. We are not persuaded.

Judges repeatedly issue arrest warrants on the basis that there is probable cause to believe that a crime has been committed and that the person named in the warrant has committed it. Judges also preside at preliminary hearings where they must decide whether the evidence is sufficient to hold a defendant for trial. Neither of these pretrial involvements has been thought to raise any constitutional barrier against the judge's presiding over the criminal trial and, if the trial is without a jury, against making the necessary determination of guilt or innocence. Nor has it been thought that a judge is disqualified from presiding over injunction proceedings because he has initially assessed the facts in issuing or denying a temporary restraining order or a preliminary injunction. It is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law.[24] We

---

[23] See *supra*, at 41–42.

[24] "The Act does not and probably should not forbid the combination with judging of instituting proceedings, negotiating settlements, or testifying. What heads of agencies do in approving the institution of proceedings is much like what judges do in ruling on demurrers or motions to dismiss. When the same examiner conducts a pre-hearing conference and then presides at the hearing, the harm,

should also remember that it is not contrary to due process to allow judges and administrators who have had their initial decisions reversed on appeal to confront and decide the same questions a second time around. See *Cement Institute*, 333 U. S., at 702–703; *Donnelly Garment Co.*, 330 U. S., at 236–237.

Here, the Board stayed within the accepted bounds of due process. Having investigated, it issued findings and conclusions asserting the commission of certain acts and ultimately concluding that there was probable cause to believe that appellee had violated the statutes.

The risk of bias or prejudgment in this sequence of functions has not been considered to be intolerably high or to raise a sufficiently great possibility that the adjudicators would be so psychologically wedded to their complaints that they would consciously or unconsciously avoid the appearance of having erred or changed position. Indeed, just as there is no logical inconsistency between a finding of probable cause and an acquittal in a criminal proceeding, there is no incompatibility between the agency filing a complaint based on probable cause and a subsequent decision, when all the evidence is in, that there has been no violation of the statute. Here, if the Board now proceeded after an adversary hearing to determine that appellee's license to practice should not be temporarily suspended, it would not implicitly be admitting error in its prior finding of probable cause. Its position most probably would merely reflect the benefit

---

if any, is slight, and it probably goes more to impairment of effectiveness in mediation than to contamination of judging. If deciding officers may consult staff specialists who have not testified, they should be allowed to consult those who have testified; the need here is not for protection against contamination but is assurance of appropriate opportunity to meet what is considered." 2 K. Davis, Administrative Law Treatise § 13.11, p. 249 (1958).

58

of a more complete view of the evidence afforded by an adversary hearing.

The initial charge or determination of probable cause and the ultimate adjudication have different bases and purposes. The fact that the same agency makes them in tandem and that they relate to the same issues does not result in a procedural due process violation. Clearly, if the initial view of the facts based on the evidence derived from nonadversarial processes as a practical or legal matter foreclosed fair and effective consideration at a subsequent adversary hearing leading to ultimate decision, a substantial due process question would be raised. But in our view, that is not this case.[25]

That the combination of investigative and adjudicative functions does not, without more, constitute a due process violation, does not, of course, preclude a court from determining from the special facts and circumstances present in the case before it that the risk of unfairness is intolerably high. Findings of that kind made by judges with special insights into local realities are entitled to respect, but injunctions resting on such factors should be accompanied by at least the minimum findings required by Rules 52 (a) and 65 (d).[26]

---

[25] Quite apart from precedents and considerations concerning the constitutionality of a combination of functions in one agency, the District Court rested its decision upon *Gagnon* v. *Scarpelli,* 411 U. S. 778 (1973), and *Morrissey* v. *Brewer,* 408 U. S. 471 (1972). These decisions, however, pose a very different question. Each held that when review of an initial decision is mandated, the decisionmaker must be other than the one who made the decision under review. *Gagnon, supra,* at 785–786; *Morrissey, supra,* at 485–486; see also *Goldberg* v. *Kelly,* 397 U. S. 254, 271 (1970). Allowing a decisionmaker to review and evaluate his own prior decisions raises problems that are not present here. Under the controlling statutes, the Board is at no point called upon to review its own prior decisions.

[26] The District Court noted that the Board had presented its findings of fact and conclusions of law to the district attorney for

The judgment of the District Court is reversed and the case is remanded to that court for further proceedings consistent with this opinion.

*So ordered.*

---

the purpose of initiating any appropriate revocation or criminal proceedings, 368 F. Supp., at 798, but made little of it and apparently did not deem the transmittal to a third party critical in light of "local realities." See *Gibson* v. *Berryhill*, 411 U. S., at 579. The District Court is, of course, free to give further attention to this issue upon remand.