## CIRCUIT COURT OF THE CITY OF ROANOKE

Bennett E. Early, Jr.

v.

City of Roanoke

Case No. (Chancery) 84-0578(C)

By JUDGE JACK B. COULTER

April 5, 1985

In reviewing [the] cross motions for summary judgment, I do not believe the record is ripe for final resolution without a more detailed Stipulation of Facts or an evidentiary hearing on the issues remaining that concern me. I am satisfied from the existing record that the City's procedure did not violate the state statute; that the City's method of rotating its panel members was not improper; and that any claim of undue partiality or impropriety because of the suggested relationship between panel member Browning and the City's primary witness Jobe is not of sufficient magnitude to warrant appellate interference. A process of limited voir dire would have cured Early's complaint on this latter point, which was not sought at the hearing.

The only issues on which I believe the record is incomplete relate to the propriety of the City Attorney representing the City's interest at the hearing while, at the same time, an associate in the City Attorney's office was advising the panel. The record should disclose who the associate city attorney was; where he sat during the hearing, or hearings, and for how long; how and to what extent he participated in the hearing or hearings;

when, how and to what extent objection might have been made; and to what extent the hearing was open to the public. A diagram showing the location of all parties, their attorneys, and the panel would be helpful.

The only other issue that remains unresolved in my mind is the propriety of two city employees being panel members in the first place. Is the record complete from an evidentiary point of view on this issue?

On both these last-mentioned questions I would invite further briefing. Why, I would ask Mr. Bonney, is not the reasoning of Judge Michael in *Breitling* v. *Solenberger*, 585 F. Supp. 289 (W.D. Va. 1984), dispositive? How do you argue around it? What authorities to the contrary can you cite? And, assuming you did not make timely objection with sufficient specificity, how do you overcome the contemporary objection rule?

On the other hand, Messrs. Lawson and Cromer are encouraged to develop their arguments further. It is offensive to me as a matter of fundamental principle for a participant in any hearing to also be a part of the team charged with resolving the matter in dispute. A batter does not call his own balls and strikes.

### May 31, 1985

Bennett E. Early, Jr., a former police officer of the City of Roanoke, has brought this bill in chancery against his former employer, the City of Roanoke, claiming that he was illegally and improperly terminated on May 12, 1984, as a police officer by a grievance panel of the City's Personnel and Employment Practices Commission. Both parties filed motions for summary judgment, orally argued their respective positions on March 29, 1985, and submitted briefs in further advance of their contentions. By opinion letter of April 5, 1985, most of the complaints raised by Early were dismissed, the Court deciding that the City's procedure did not violate the State statute in the particulars specifically urged by the complainant; that the City's method of rotating its panel members was not improper; and that any claim of undue partiality or impropriety because of the suggested relationship between the chairman of the panel, Bobby Browning, and Lt. Jobe, the City's primary witness, was not of sufficient magnitude to warrant court interference. Such claimed friendship could have been exposed by a

limited voir dire of the panel which, the Court suggests, should be routinely made available in future hearings.

Procedural due process as to the propriety of the City Attorney advocating the City's interest in partisan posture while, at the same time, his chief assistant is advising the panel, even joining with them in their private deliberations, is the primary issue remaining. Whether or not two City employees should serve as members of the nine-member panel is an associated question raised by the Court. Additional evidence on these points was solicited and submitted at an evidentiary hearing on May 1, 1985. And additional briefs on these questions have also now been presented.

Neither the merits of the panel's decision nor the fundamental integrity of the City Attorney, Wilburn C. Dibling, Jr., and his assistant, William X. Parsons, or members of his staff, is at issue. The primary concern of the Court is the propriety of one's partner actively and openly serving as an advisor to a quasi-judicial body that is hearing a dispute in which he is a partisan advocate.

The same concern is addressed in Mr. Dibling's Interdepartment Communication of May 9, 1979 (Exhibit C), in which he states:

> It is most important that the Office of the City Attorney not have a conflict of interest in adversary matters before the Commission. The Attorney who advises the Commission or a panel thereof is a neutral party performing a quasi-judicial function. An attorney presenting a case on behalf of the Administration is an advocate; it is his role to sustain the action of the Administration. Both roles are vitally important. *Of course, it would be a conflict of interests and a violation of the Canons of Ethics for the same attorney to advise the Administration and the Commission in the same matter.* (Emphasis added).

If, as the City Attorney concedes, it would be improper for the same attorney to advise the Administration and the Commission in the same matter, it would seem axiomatic that a junior partner or chief assistant should not advise the decision-making body when his senior is

advocating the cause of one of the participants. The case of *Brownlee v. Williams*, 212 S.E.2d 359 (Ga. 1975), cited by Mr. Dibling in his Interdepartment Communication as approval for this procedure, did not actually condone it, the Court only holding that the record in that case did not show any prejudice to the discharged employee.

Mr. Dibling further recognizes the same concern that disturbs the Court when he continues:

> In order to preclude any conflict or *appearance of impropriety*, Mr. Parsons has been assigned to serve as counsel to PEPC on a permanent and regular basis.

But how does such assignment "on a permanent and regular basis" remove the appearance of impropriety? This must be the "Chinese Wall"[1] to which the defendant's attorneys have referred in their argument. But no amount of internal direction, staff discipline, screening procedures, noble motive or worthy objective, which by nature would not be particularly public, could possibly overcome the understandable suspicions and doubts about basic fairness when one contestant sees his opposing counsel's chief assistant not only advising the ultimate decision-maker but actually sitting on the bench with them and being closeted with them during the privacy of their deliberations.

It is difficult to penetrate so well written a brief as that submitted by the defendant, but the point at issue, at least the one most compelling to the Court, is that of appearances. It is the appearance of propriety that is as fundamental to the notion of due process, or should be, as the reality of impropriety. For at stake is public confidence in the delivery of justice, whether in a judicial or quasi-judicial setting.

---

[1] Though the terms "screening" and "Chinese Wall" are synonymous, as footnoted in the Note, "The Future of the Chinese Wall Defense to Vicarious Disqualification of a Former Government Attorney's Law Firm" 38 Wash. & Lee L. Rev. 151, 152, n. 5 (1981), the same article notes that the effectiveness of the Chinese Wall's screening and its appropriateness are subjects of continuing debate. The screening process suggested in order to make the Chinese Wall theory acceptable contemplates an outside monitor; one simply does not screen oneself!

As noted in *Withrow v. Larkin*, 421 U.S. 35, 43 L.Ed.2d 712, 95 S.Ct. 1456 (1975):

> A fair trial in a fair tribunal is a basic requirement of due process. *This applies to administrative agencies which adjudicate as well as to courts.* (Emphasis added).

The theme of the thought is codified in Canon 9 of the Code of Professional Responsibility: "A Lawyer should avoid even the *appearance* of Professional Impropriety." If individual members of the legal profession, then, are directed to avoid the appearances of impropriety, are the standards of our government to be less? It would be totally unheard of for one law partner to advise a decision-making body charged with deciding a case in which another partner was actively pursuing the interests of one of the litigants. Are the ethics of governmental activity any less than the private sector? Is it too "pristine"[2] to insist that in a judicial setting one advocate's partner does not sit at the judgment seat nor go to the jury room with the jury?

As expressed by Justice Frankfurter in *Offutt v. United States*, 348 U.S. 11, 99 L.Ed 11, 16, 75 S.Ct. 11 (1954):

> These are subtle matters, for they concern the ingredients of what constitutes justice. *Therefore justice must satisfy the appearance of justice.* (Emphasis added).

Or as noted by Justice Powell in *Carey v. Piphus*, 435 U.S. 247, 262, 55 L.Ed.2d 252, 264, 98 S.Ct. 1042 (1978):

> a purpose of procedural due process is to convey to the individual a feeling that the government has dealt with him fairly.

---

[2] Judge Michael wrote in Breitling v. Solenberger, 585 F. Supp. 289 (W.D.Va. 1984), in holding that a teacher was not denied due process on the ground that the same attorney who represented the superintendent's case for dismissal acted as advisor to the school board as well: "due process has never demanded a "pristine" separation of adjudicatory and investigatory functions."

In all candor, objectivity and honesty, how can one seriously contend that the *appearance* of justice has been satisfied when one's opposing counsel had his associate at the seat of judgment and in the chambers of decision? How under such circumstances and atmosphere can a feeling of fair dealing be conveyed to an individual seeking relief that is in strenuous dispute?

It is a terribly presumptuous trial judge who, in the face of some of the authorities urged upon him and knowing the caliber of the personnel involved, contends that his function includes correcting a practice through this individual case that simply should not be permitted to continue. A procedure that permits a junior member of the City Attorney's Office to sit with the judges, as if he were one, in judgment of a case in which his senior, who controls in large measure his professional career, represents one of the contending parties cannot, in good conscience, be condoned. And to go into the jury room, to be closeted in private with the decision-makers in a case in which his superior has urged a certain result, cannot help but create the impression, irrespective of how impenetrable the Chinese Wall may have been constructed, that one side has an "inside" influence over the other. To give the judicial stamp of approval to this practice, when courts are or should be concerned not only with concepts of due process but with the value-setting impact of their decisions[3], is a result intolerable and unacceptable to this Court.

The defendant urges that no prejudice has been shown nor contemporaneous objection made which under certain principles would carry the day. But if what we are concerned about is the *appearance* of propriety whether one is in fact actually prejudiced really begs the question, which is the holding in *Carey, supra*:

> Because the right to procedural due process
> is "absolute" in the sense that it does not
> depend on the merits of a claimant's substan-
> tive assertions, and because of the importance

---

[3] See Jerry L. Mashaw, "Due Process in the Administration State" (Yale University Press, 1985), in which Mashaw argues for an approach that integrates substantive procedural rights and the inherently value-creating role of the court.

to organized society that procedural due process be observed, (cases cited), we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury.

But the City argues that there is no feasible alternative; that the City Code requires the City Attorney to give legal advice to its boards and commissions; and that to require outside counsel would impose too heavy a burden to resolve a matter that could have been heard, as far as due process is concerned, by the City Manager himself or one of his departmental heads. There are, however, clearly acceptable alternatives; the requirement to serve as legal advisor does not demand the City Attorney's presence at contested hearings or in a jury room. If his role is so passive, if all evidence is admitted anyway, as the City argues, then his attendance is really not needed. He can advise when asked, as the Commonwealth Attorney does at Grand Jury proceedings, but he does not have to be present in order to perform the function contemplated by the Code. Outside counsel, hence, would not be required. And the suggestion that the City Manager, or one of his lieutenants, could have handled the matter as far as due process is concerned is quite beside the point. The statutes no longer permit such Victorian practice; grievance procedures are the rule of the day.

As to the other issue of whether or not two City employees should be members of the nine-member City grievance panel, the defendant in its last brief has misconstrued the Court's previous ruling. This precise point was *not* addressed in the letter opinion of March 25, 1985. The Court ruled that the City's grievance procedure did not violate the State statutes and that the City's method of rotating its panel members were not improper, but both of these rulings were made in the context of the complainant's arguments. The complainant had urged most strenuously that the State grievance procedure affirmatively provided the grievant with the right to select a member of the panel and that thereafter the grievant's selection and the employer's selection would choose a third member, which is precisely the requirement of Section 2.1-114.5:1(D)(4) of the Code of Virginia. The City was able to establish that its procedures which predated the State's requirements had been expressly approved.

The complainant had also argued that the City's own procedures required the panels to serve on a rotating basis which was not respected in this case. Again, the City successfully rebutted this position. But the issue of whether or not two City employees should be permitted to sit on a panel in judgment of the actions of their employer was not considered.

Section 2-83(b) of the Code of the City of Roanoke provides that City Council "shall ensure that. . . at least two (2) members (be) from the classified service of the City." This requirement may have been, and probably was, well-intentioned, the apparent objective being to have City employees available to "represent" the interests of a grievant, to give the employees a "voice" on the commission, and to satisfy any desire for peer presence. But how naive can we be? Such a person as a prospective juror, an employee of one of the parties, would be struck for cause without question, quarrel or quibble. We are concerned here, as stated in the City Code, that "the Commission members shall have those characteristics of open-mindedness and fairness required to fairly and impartially hear and resolve differences." But such legislative platitude must amount to more than words. The individual members of this commission may well be as open-minded and fair as the nature of man might permit, but once again the appearances of the matter rise to transcendent importance. A decision-making tribunal, even one of administrative function, simply should not include members whose loyalties, conscious or subconscious, are tilted toward one on the competing parties. As noted by Paul A. Freund, testifying before Congress on legislation to protect the independence of the special Watergate prosecutor on November 7, 1973:

> [T]he problem inheres in institutional arrangements. That is why we have conflict-of-interest laws, not that someone appointed Secretary of the Treasury or Attorney General cannot be trusted, but that he must be above suspicion and that his judgment must not be deflected one way or the other by being put in what may appear to be a compromising position of conflicting loyalties. It is just as bad for a man of honor to lean over backwards to avoid the imputation of bias as it is to be actually

biased so far as these important functions in the administration of justice are concerned . . . . *The problem is to arrive at an institutional arrangement that is not dependent on confidence in the individual.* (Emphasis added).

The problem is, as Freund concludes, to arrive at an institutional arrangement that is not dependent on confidence in the individual. That is why we are a government of laws and not of men. And that is precisely what we have here, an institutional arrangement, however well-intentioned, that depends entirely on the nobility of individual character. A City employee, hearing all types of intrafamily gossip at coffee breaks, employee meetings or Christmas parties, dependent on so many fellow employees and department heads for favorable response to his employment needs, and presumptively loyal and dedicated to the hand that feeds him, simply should not be put in the position where his judgment may be deflected because of conflicting loyalties. Allowing a City employee to sit in judgment in a judicial setting in which his employer is urging a certain result simply does not give a grievant the proper process that is his due.

In conclusion, then, procedures which permit the City Attorney through one voice to sit with the judges and attend their private deliberations in resolving a dispute in which another voice has urged a particular result and which further allow City employees to be part of the tribunal deciding cases in which their employer is a contending party are simply too offensive to the appearances of fair play and due process to receive the approval of a court of justice. Such procedures are not in keeping with the high standards of excellence in all matters to which this City is so firmly committed. Accordingly, this case is remanded for a rehearing to be conducted in keeping with the principles herein set forth.