# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

————————

No. 07-3208

————————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Western District of Missouri. |
| | * | |
| Joy Dayle Wessels, | * | |
| | * | |
| Appellant. | * | |

————————

Submitted: April 17, 2008
Filed: August 27, 2008

————————

Before GRUENDER, BRIGHT, and BENTON, Circuit Judges.

————————

BENTON, Circuit Judge.

Joy Dayle Wessels was convicted of unauthorized use of a credit card, 18 U.S.C. § 1029(a)(2). She was sentenced to 12 months' imprisonment and three years' supervised release. Later, the district court[1] revoked her supervised release, imposing a sentence of 12 months' imprisonment and 24 months' supervised release. Wessels appeals, asserting a Fifth Amendment right to due process. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

_____

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

At the revocation hearing, Wessels stipulated to violations of her supervised release. During the hearing, she learned that the probation officer, Sylvia A. Gruenbacher, had disclosed the sentencing recommendation to the government – but not to her – despite her counsel's specific request for it. The government offered support of "Miss Gruenbacher's recommendation to the court," while Wessels's counsel said, "I don't even know what the recommendation is." The court stated that the recommendation was "18 months with 18 months of supervision to follow." Wessels's counsel noted "for the record, we tried to obtain what the position is, the government and probation."

Wessels argues that the ex parte communication between the probation officer and the government violated her due process right to a fair tribunal. This court reviews claims of constitutional error de novo. *United States v. Washington*, 318 F.3d 845, 854 (8th Cir. 2003). Due process requires that a trial proceed before a judge with no actual bias against the defendant or interest in the outcome of the particular case. *Veal v. Iowa Corr. Inst. for Women*, 274 F.3d 479, 480 (8th Cir. 2001). The appearance of bias may also be a ground for disqualification. *Ryan v. Clarke*, 387 F.3d 785, 793 (8th Cir. 2004). The situation must be one "in which experience teaches that the probability of actual bias on the part of the judge . . . is too high to be constitutionally tolerable." *Kinder v. Bowersox*, 272 F.3d 532, 540 (8th Cir. 2001), *quoting Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

Here, the record shows no actual bias, or appearance of bias, from the ex parte communication. The district court found that the communication between the government and the probation office was irrelevant to the sentencing decision, concluding: "It doesn't matter. It's my decision to make at any rate."

Wessels also contends that the probation officer and the government based their recommendations on unproven and uncharged allegations of criminal activity, violating due process and Federal Rule of Criminal Procedure 32.1(b)(2). No

violations occurred. Although Wessels's counsel noted "there is [sic] some additional allegations out there," the record shows that the district court properly based the sentence on the stipulated violations of supervised release, not unproven or uncharged criminal activity. *See United States v. Davies*, 380 F.3d 329, 333 (8th Cir. 2004) (finding no violation of Federal Rule of Criminal Procedure 32.1(c) or due process because the "fact that the probation officer might have been motivated by comments received from an unknown Bureau of Prisons employee does not change the fact that the district court properly relied on information contained in the presentence report to justify the modified conditions.").

The judgment of the district court is affirmed.

BRIGHT, Circuit Judge, concurring.

I concur in the opinion in this case but I write separately to call attention to the Second Chance Act of 2007. Pub. L. No. 110-199, 122 Stat. 657 (April 9, 2008). In this Act, the Congress has directed a shift from policing those on parole to rehabilitating them. The parole system now bears an increasing special obligation to help federal offenders successfully reenter into society.

Any time a person serves a prison sentence, begins parole or supervised release, and then, as in this case, violates a provision of release that may justify re-imprisonment, the correctional system has failed. In making this statement, I do not mean to comment adversely on probation officers. I do, however, call attention to this new wind that is refreshingly blowing into the correctional systems in this country.

Title II(C)(1) of the Second Chance Act aims to improve the reentry of federal offenders into society with the help of probation officers. Specifically, § 231 requires that the Attorney General and the Director of the Bureau of Prisons establish a comprehensive prisoner reentry program. The Bureau must assess each prisoner's skill level at the beginning of imprisonment to identify areas in need of improvement,

create a skills development plan for each prisoner, coordinate with other agencies to ease a prisoner's reentry to society, and collect information on family relationships to encourage these relationships. Furthermore, § 231 permits a direct-release prisoner to request the help of a representative of the United States Probation System in developing a release plan.

It is clear that the spirit of the Second Chance Act of 2007 intends that the entire penal systems, state and federal, work towards the rehabilitation of prisoners for the purpose of reducing recidivism. Title I, § 101 amends the Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 197 *et seq.* so as to prioritize funding to those local governments that can deliver continuous and appropriate drug treatment, medical care, job training and placement, educational services, or any other service or support needed for reentry.

Furthermore, as a condition of receiving financial assistance under Title I, § 101, local governments must develop a comprehensive strategic reentry plan for inmates. In developing such a plan, local governments must coordinate with communities and stakeholders that can provide reentry services, which includes people in the fields of public safety, juvenile and adult corrections, housing, health, education, substance abuse, victims services, and employment.

Finally, the Second Chance Act's authorization to appropriate significant sums of money illustrates the Act's commitment to rehabilitating inmates and facilitating their reentry into society.

The Second Chance Act of 2007 therefore revises the duties of parole and probation officers, focusing much of their attention to the rehabilitation of those who have served prison sentences. Such a recent but important development must be underscored so that the Act may change the attitudes and focus of probation from policing parolees and probationers to rehabilitating them.

Indeed, if the Second Chance Act had been in effect during Ms. Wessels's supervised release, with proper assistance and supervision she may well have successfully served her probationary (supervised release) period of time.

---