Nikhil I. PATHAK, Plaintiff,

v.

DEPARTMENT OF VETERANS AFFAIRS, Defendant.

No. CIV. 95–CV–279–B.

United States District Court, D. Maine.

Jan. 19, 2001.

Alton C. Stevens, Marden, Dubord, Bernier & Stevens, Waterville, ME, for Nikhil I. Pathak, plaintiff.

David R. Collins, Office of the U.S. Attorney, Portland, ME, Gail Fisk Malone, U.S. Attorney's Office, Bangor, ME, for Department of Veterans Affairs, defendant.

## MEMORANDUM OF DECISION [1]

KRAVCHUK, United States Magistrate Judge.

Plaintiff Nikhil Pathak is a physician and the director of the renal dialysis unit ("RDU") at the Veterans Administration Medical and Regional Office Center at Togus, Maine ("the Center"). On December 19, 1995, Plaintiff filed a "Complaint for Review of Administrative Action," that challenges the Center Director's decision to impose on him a seven-calendar-day suspension without pay for sexually harassing Kathleen Lyons, head nurse of the renal dialysis unit, and also challenges the

---

1. Pursuant to Fed.R.Civ.P. 73(b), the parties have consented to allow the United States Magistrate Judge to conduct any and all proceedings in this matter.

decision of the Department of Veterans Affairs grievance examiner and its Regional Director to approve the Director's determination and deny Plaintiff relief pursuant to his formal grievance (Count I). In addition to challenging the sexual harassment finding, Plaintiff asserts that the Center Director was biased against him and prejudged the case, in violation of Plaintiff's constitutional rights to equal protection and due process of law under the Fifth Amendment (Counts II and III). The Department of Veterans Affairs moves for summary judgment on all three counts.

## Procedural Background

On April 7, 2000, I issued an Order officially staying this "appeal" until judgment should be entered in Lyons's then pending civil suit against Pathak and the Department of Veterans Affairs. That stay lifted pursuant to my Order dated May 4, 2000. Prior to my stay order, this matter had simply lain dormant for several years while the Department, counsel for Pathak, and counsel for Lyons litigated Lyons's claims against the Department and Pathak. My Order of May 4 returned this matter to the active docket. On July 28, 2000, I presided over a telephone conference that resulted in the issuance of an amended scheduling order. In response to plaintiff counsel's request that he be given some leeway to pursue discovery on his due process claim, I permitted Plaintiff some discovery narrowly focused on the issue of what communications took place between the Center Director, who presided over Plaintiff's suspension, and other Department personnel.

Although Plaintiff's three-count complaint is captioned as a complaint for review of administrative action, Plaintiff also seeks a jury determination on Counts II and III, which allege equal protection and due process violations, respectively. In other words, the complaint is internally inconsistent, which makes it difficult to determine whether Counts II and III simply set forth additional reasons for reversing the VA's disciplinary action or seek additional relief of some unspecified form. Because Plaintiff's filings do not indicate what additional relief he seeks on Counts II and III, other than a reversal of the suspension, I consider these counts to be additional grounds for his "Complaint for Review."

The statutory and regulatory grounding for this appeal and the underlying disciplinary and grievance processes exists in portions of the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*, the Department of Veterans Affairs Health–Care Personnel Act of 1991, 38 U.S.C. §§ 7461 & 7463, and in the Department of Veterans Affairs Disciplinary and Grievance Procedures, MP–5, Part II, Chapter 8, and Supp. MP–5, Part II, Chapter 8.

## Scope and Standard of Review

With respect to the scope of review, the record in this case consists of the record compiled during the administrative proceedings. *See* 5 U.S.C. § 706 (1996). With respect to Count I, I have reviewed the charges listed in the notice of suspension, which I conclude the Center Director determined to be the facts of the case, as established over the course of the investigation and Pathak's written and oral response to the charges.[2] With respect to Counts II and III, I confess to being troubled by the state of the record. To begin, I have reviewed the administrative record to the extent that the parties' statements of material fact cite to it. However, parts of Plaintiff's Count II and III arguments are constructed out of statements made during depositions taken in Kathleen Lyons's separate but related civil suit. These depositions cannot be considered part of the appellate record in this case.

2. I consider this proper because Plaintiff does not challenge these facts, but only argues what inferences are to be drawn from them and what legal significance they have. In other words, Plaintiff does not contend that the record cannot support any of these findings.

Furthermore, there is no indication that the statements drawn from these depositions were introduced in the course of Plaintiff's grievance. My assumption is that the Department and the Plaintiff, in an effort to avoid taking further depositions in this matter, which had already been extensively taken in Lyons's suit, agreed to supplement the record in this fashion. I consider the record on these counts to consist of those statements of fact supported by citations to the administrative record and the supplemental depositions taken in 2000 pursuant to my scheduling order. In addition, I have considered some of the factual statements Plaintiff supports with extra-record citations where, and to the extent that, the Department has admitted them.

With respect to the standard of review, because I consider all three of Plaintiff's counts to set forth alternative grounds for reversal of the Department's decision, I do not intend to depart from the standard applicable to claims for review of agency determinations.[3] Accordingly, I will affirm the Department's determination to suspend Plaintiff unless I find (1) that the Department acted arbitrarily or capriciously, abused it discretion, or failed to act in accordance with law, *id.* § 706(2)(A); (2) that the Department's determination was arrived at through a violation of Plaintiff's constitutional rights or without following the laws and regulations applicable to the disciplinary and grievance processes, *id.* § 706(2)(B)-(D); or (3) that

the Department's determination is unsupported by substantial evidence, *id.* § 706(2)(E). *See Dickinson v. Zurko,* 527 U.S. 150, 152, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) ("The Administrative Procedure Act (APA) sets forth standards governing judicial review of findings of fact made by federal administrative agencies.")

**Background**

On December 1, 1994, Kathleen Lyons submitted a memorandum to the Assistant Chief of Nursing Services, Marianne Taylor, complaining of Pathak's conduct toward her during a trip to Chicago in June 1994 for a research conference in their field. This informal complaint essentially commenced an EEO investigative process at the Center and Lyons ultimately filed a formal EEO complaint on January 13, 1995. Based on these complaints and investigations related to them, the Center also commenced an administrative, disciplinary investigation against Pathak. David Rankin, the labor relations officer at the Center, participated in overseeing this investigation, but he did not conduct it. It fell to E. Douglas Holyoke, M.D., Chief of Staff at Togus, to develop the charges and generate a proposed disciplinary action, although Rankin apparently drafted the charging instrument after reviewing the evidence and making sure it was "proper." On March 16, 1995, Lyons met with members of the Center's management, including the Center Director, to discuss settling her EEO complaint.[4] In a memorandum prepared by Acting EEO Program Manag-

**3.** Plaintiff argues in his brief that Counts II and III, at least, should be analyzed under the summary judgment standard of review. He also relies upon a portion of the Administrative Procedures Act [5 U.S.C. § 554] as providing statutory support for his claim. This confounding of a "Complaint for Review" and an independent cause of action for a claimed constitutional violation continues to confuse the analysis of this case. However, I conclude that even if all of the facts relating to the Center Director's alleged bias were viewed in the light most favorable to Plaintiff, there would still be insufficient evidence of a constitutional violation. Thus, as to Counts II and III, it makes little difference whether the record is reviewed with deference pursuant to

the "APA" or reviewed in the light most favorable to Plaintiff under summary judgment review.

**4.** In the September 6, 2000 deposition of Kathleen Lyons, taken pursuant to my scheduling order, plaintiff counsel questions Lyons regarding a memorandum prepared by Palmer Sargent, Acting EEO Program Manager. Although he does not formally introduce or otherwise offer this memo into the supplemental record—there is no index of exhibits in the 2000 deposition—I have considered it anyway. The Department objects that the statement is hearsay.

er Palmer Stevens following the meeting, Stevens wrote, "Mr. Sims ... assured [Lyons] that some type of reprimand would be forthcoming to Dr. Pathak and this seemed to be reassuring to Ms. Lyons that something was being done." On March 17, 1995, Pathak received a notice of a proposed 14–calendar day suspension, without pay, from Holyoke. The notice recited 14 incidences alleged to have occurred between Pathak and Lyons between June 22, 1994 and January 20, 1995, and informed Pathak that each of the 14 "charges" constituted "a separate incident of sexual harassment" and that, taken together, they "show a pattern of sexual harassment." Those charges provided as follows:

a. On June 22, 1994, while in travel status in Chicago, Illinois, along with Kathleen Lyons, RN, you requested a hotel room near the room assigned to Ms. Lyons; entered Ms. Lyon's [sic] hotel room and attempted to unpack her garment bag; insisted on paying for her dinner; tried to persuade her to visit the Sears Tower with you and, while doing so, took her by both arms and attempted to push her down the street; and telephoned her to visit you in your hotel room.

b. On June 24, 1994, while in travel status along with Ms. Lyons at O'Hare Airport you took Ms. Lyons [sic] luggage and put your name on the tags; intervened in her ticketing, took her ticket, and put it in your jacket pocket; insisted on sitting next to her; and refused to return her ticket until she reached for your jacket to take it herself.

c. On June 30, 1994, you remarked to Ms. Lyons, or used words to the effect, that she was "walking around in her white coat and high heels like she was a big person—big as in important."

d. On July 22nd and 25th, 1994 you disseminated mailman messages to eight recipients which denigrated Ms. Lyons. The July 22, 1994, message stated that a meeting under discussion was "a futile exercise as one person [Ms. Lyons] asked me the material needed for the meeting, I had thought this was expected for all to know." The July 25, 1994 message stated that "it does strike me as hypocritical for anybody in this hospital to say that they are busy with patients." Ms. Lyons had made reference to being busy with patients in a July 25, 1994 message to the same group of recipients which included you.

e. On August 8, 1994, you sent a memorandum to the Chief of Staff and Chief of Medicine with a copy to the Chief Nurse complaining about Ms. Lyons.

f. In a mailman message to Ms. Lyons dated August 30, 1994, you accused her of making a false statement to Mr. Foster [Chief Medical Administration Service]. You further informed her that you would run the show [in RDU] as you saw fit and she could complain to your Chief of Service or hers if she did not like it.

g. On September 8, 1994, you stated to Ms. Lyons, or used words to the effect, that "I really love you and have felt awful but haven't been able to stop myself from acting this way." You then hugged Ms. Lyons.

h. On September 8, 1994, you stated to Ms. Lyons[,] or used words to the effect, that "you are a better person than I am ... and I love you." You further stated on this occasion, or used words to the effect, that "Randy [Ms. Lyon's [sic] spouse] will be flattered to know that he has some competition".

i. On October 20, 1994 you stated to Ms. Lyons, or used words to the effect, that "I'm going to put my sexual feelings aside and give you a birthday hug." You then hugged Ms. Lyons.

j. On or about November 10, 1994, you asked Allison Daigle, RN, whether she would like to be the Head Nurse in the Renal Dialysis Unit. Ms. Lyons is, and was at all times pertinent to this pro-

posed action, the incumbent in this position.

k.  On November 16, 1994, Ms. Lyons requested a meeting with you via mailman message regarding RDU matters. On November 21, 1994, you responded by mailman message that you were "content with whoever is in charge to quickly talk about the issues."

l.  On November 26, 1994, you dictated a patient history and physical which named Ms. Daigle, rather than Ms. Lyons, as the Head Nurse of the Renal Dialysis Unit.

m.  On December 5, 1994, you disseminated a mailman message to six recipients.  In it you referred to one person's vendetta as slandering your character. You concluded the message by saying[,] "So this is a goodbye from the soul.  No, I am not leaving, someone else will." These veiled references were to Ms. Lyons.

n.  On January 20, 1995, while discussing the need for lab data on a patient with Sylvia Becker, R.N., you gave her a choice between doing a stool collection in the SCU or sending the patient to Ambulatory Care Service.  When Ms. Becker responded by saying she needed to ask Ms. Lyons what to do, you stated, or used words to the effect, that, "You don't have to ask Kathy anything, send him to ACS."

Because the notice was merely a charging instrument, it remained for the Center Director, John H. Sims, Jr., to review and decide the "case" after Pathak had a chance to respond.  Pathak retained legal counsel to represent him before the Center Director.  Pathak's counsel submitted a legal opinion letter to the Center Director on March 22, 1995 and also orally argued Pathak's position on April 6, 1995.

On April 18, 1995, the Center Director informed Pathak that the charges had been sustained and a decision made to suspend Pathak without pay for seven calendar days.  Those charges compose the factual background for the Center Director's conclusion that Pathak sexually harassed Lyons.

The EEO proceeding and the Department's disciplinary proceeding are distinct procedures.  However, the commencement of disciplinary proceedings in this case followed in the wake of the EEO proceeding and began because the EEO officers, the Center Director included, considered the EEO complaint to have merit.  As the Center's EEO Officer, the Center Director was responsible for overseeing Lyons's EEO complaint and for ensuring that any allegedly inappropriate conduct would cease and that the operation of the RDU would be able to proceed without further incident.  Moreover, it appears from the record that the Center Director desired to reach a resolution that would satisfy Lyons and prevent her from feeling the need to proceed with her formal EEO complaint against the Department.  Finally, it is clear from the parties' statements of material fact that the lines of communication were generally open between the Center Director and Rankin throughout the course of the disciplinary investigation.

On April 26, 1995, Pathak filed a grievance with the Department's Regional Director for the Eastern Region, Barbara L. Gallagher, and requested a hearing before a grievance examiner.  Grievance examiner Douglas Bender conducted a hearing at the Center on June 21 and June 22, 1995, and a final, telephone hearing on July 6, 1995.  At the conclusion of these hearings, the grievance examiner inquired of plaintiff counsel, "Mr. Stevens, do you feel you've had—you've been given a full opportunity to present your side of the case?"  Mr. Stevens replied in the affirmative.  In an undated report of his findings and recommendation, the examiner concluded that the facts represented in the charges were accurate and found Lyons's testimony concerning the sexual and retaliatory nature of these incidents to be more credible than Pathak's opposing testimony. The examiner then concluded that the

facts were legally sufficient to support a finding of sexual harassment.[5] On August 2, 1995, the Department's Regional Director for the Eastern Region accepted the examiner's recommendation and Pathak's grievance was denied.

### Discussion

1. *Count I—Whether the Center Director's legal finding of sexual harassment is supported by his factual findings?*

■ In his memorandum on Count I, Plaintiff Pathak argues that his conduct was not sufficiently egregious to support a legal finding that Lyons was placed in a hostile or abusive work environment. He insists that he cannot have sexually harassed Lyons unless he had subjected her to continued explicit propositions, sexual epithets, or persistent offensive touching, citing *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 477 (5th Cir.1989). He then addresses eight of the charges that describe conduct "in no way sexual." Plaintiff insists that these events reflect not reprisals against Lyons for rebuffing his advances, but "demonstrate an ongoing dispute" relating to the management of the

RDU. Plaintiff maintains that to the extent Lyons believes there was sexual innuendo in his conduct in Chicago, she has simply misunderstood his intentions as a result of their cultural differences.

Of course, I do not consider it my prerogative on review to reevaluate whether the events described in these charges were reprisals or not, or whether Plaintiff's conduct in Chicago was sexual or not. The Center Director, like the grievance examiner, clearly rejected Plaintiff's factual arguments on this score and considered these non-sexual acts to have occurred due to animosity arising from those incidents in Chicago. Thus, the sole question I consider is whether the charges set forth in the notice of proposed suspension—which are not challenged here as being unsupported by the evidentiary record—when taken together,[6] could rationally support a finding of sexual harassment. *See Sistema Universitario Ana G. Mendez v. Riley*, 234 F.3d 772 (1st Cir.2000) (quotation omitted) ("[U]nder 'arbitrary and capricious' review, the court may not substitute its judgment for that of agency officials but rather must focus on whether the agency examined the relevant data and

5. In a well-written conclusory paragraph to his "findings and recommendations," the examiner reasons:

    I find it reasonable that Ms. Lyons would find it uncomfortable when a male co-worker, who occupies a position superior to hers in the hierarchy of the Medical Center, has his room moved closer to hers and then attempts to unpack her garment bag, insists on paying for her dinner, physically tries to persuade her to visit the Sears Tower and then invites her to his room that night. I am persuaded that Ms. Lyons immediately took these events seriously and that they disturbed her. Testimony was given that she told co-workers upon her return to Togus that events occurred in Chicago that made her uncomfortable. Dr. Pathak proceeds on several occasions to embarrass Ms. Lyons in front of her peers and superiors through mailman messages and memorandums (charges d, e, m). He physically hugs Ms. Lyons on several occasions, tells her he loves her, tells her that her husband has competition and that he is going to put his sexual feeling aside (charges g, h, i).

    Other staff members testify as to seeing these incidents. Testimony is given that Ms. Lyons is driven to tears during one of these incidents. On four separate occasions Dr. Pathak intimates [that] he does not want Ms. Lyons as Head Nurse of RDU or no longer considers her as such. Ms. Lyons testified that other staff members joked about how Dr. Pathak was not recognizing her as the Head Nurse, RDU. This became hurtful and undermined her ability to function in her position. I find that this behavior was mentally and physically humiliating and was frequent enough to create a hostile, intimidating and offensive work environment for Ms. Lyons.

6. Pathak contends that I must only consider each charge individually because the charging instrument stated that each charge amounted to an incident of sexual harassment. I do not agree that this Court is limited in this fashion. The notice of proposed suspension clearly stated that these events also amounted to a pattern of sexual harassment when taken together.

articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.")

To begin, Plaintiff is incorrect that a finding of sexual harassment requires continued explicit propositions, offensive touching, or subjection to sexual epithets. The Fifth Circuit case Plaintiff cites for this "general" rule is not supportive of this bold assertion. In fact, the Fifth Circuit states in that case that sexual harassment may include a much broader category of conduct such as "sexual advances, requests for sexual favors, and *other verbal and physical conduct of a sexual nature that is unwelcome* in the sense that it is unsolicited or unincited and is undesirable or offensive to the employee." *Waltman*, 875 F.2d at 477 (emphasis added). The Supreme Court has set forth the standards applied to allegations of a discriminatorily hostile or abusive environment:

> Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). As we made clear in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), this language "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment," which includes requiring people to work in a discriminatorily hostile or abusive environment. When the workplace is permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," Title VII is violated.

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citation omitted).

In my assessment, I can agree with Plaintiff that his conduct was not as lewd and lascivious or as victimizing as that described in many of the reported cases of sexual harassment. However, I cannot conclude that the Center Director abused his discretion when he concluded that Plaintiff sexually harassed Lyons. I consider the facts found by the Center Director to be sufficient to permit a reasonable person to conclude that Plaintiff's conduct created an environment that was hostile or abusive enough to interfere with Lyons's ability to perform her job and to make subjection to ridicule and humiliation, not to mention further unwanted sexual comments and overtures, a condition of her job. That such conditions were an outgrowth of a rebuffed, unwanted sexual advance and were characterized by further humiliating sexual advances and contact is one permissible conclusion to be drawn from the facts and sufficiently generates a nexus to Lyon's gender to justify the action taken pursuant to Title VII.

2. *Counts II and III—Whether the Center Director violated Plaintiff's rights to due process or equal protection?*

█ In Count II of his Complaint, Plaintiff states, "[B]ecause plaintiff is a male, defendant accepted allegations made by Kathy Lyons without conducting an adequate independent investigation as to the truth of her allegations." This is the only allegation in the Complaint that could support an equal protection claim. However, Plaintiff fails to pursue this issue in any of the memoranda currently under consideration. For that reason, I consider Plaintiff to have waived his equal protection claim. *See Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 205 (1st Cir. 1999) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived for purposes of appeal.").

■ The real gravamen of Plaintiff's non-evidentiary appeal is the contention that he was not accorded due process of law because the Center Director was not impartial. Specifically, Plaintiff argues that the Center Director could not provide him with a fair hearing because the Center Director had been instrumental in the investigation and creation of the charging instrument. Although Plaintiff acknowledges that the Center Director's involvement in both the investigation and the judgment was not per se illegal, he contends that it was in his case because it violated the Administrative Procedures Act ("APA"), 5 U.S.C. § 554, which requires that different officials preside over the investigative and the adjudicative proceedings. Plaintiff also argues that, even if the APA was not violated, "the probability of bias on the part of [the Center Director] was too high to be constitutionally tolerable."

Section 554 of Title 5 of the United State Code provides, in pertinent part:

§ 554. Adjudications

(a) This section applies, according to the provisions thereof, in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, except to the extent that there is involved—

\*       \*       \*       \*       \*       \*

(2) the selection or tenure of an employee, except a[n] administrative law judge appointed under section 3105 of this title;

\*       \*       \*       \*       \*       \*

(d) The employee who presides at the reception of evidence pursuant to section 556 of this title shall make the recommended decision or initial decision required by section 557 of this title, unless he becomes unavailable to the agency. Except to the extent required for the disposition of ex parte matters as authorized by law, such an employee may not—

(1) consult a person or party on a fact in issue, unless on notice and opportunity for all parties to participate; or

(2) be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency.

Section 554 thus requires that in all agency "adjudications" the agency employee who serves as a decision maker must be insulated from those employees who serve the agency in an investigative or prosecutorial role.

The Department argues that Section 554 is inapplicable because subsection 554(a)(2) excludes employee tenure issues from the requirements of Section 554 and because Plaintiff's employment is governed by Title 38, not Title 5. I agree with the Department that Section 554 is inapplicable to the Department's disciplinary proceedings. Because the *discharge* of an employee is a matter relating to employee tenure, *see Normile v. McFague*, 685 F.2d 9, 10 n. 2 (1st Cir.1982), I agree with the Department that lesser employee disciplinary measures such as suspensions are similarly excluded from the requirements of Section 554. Because I conclude that Section 554 of the APA does not apply to this case and because Plaintiff does not contend that the Department's own employment policies and procedures were violated, I cannot find any statutory grounding for Plaintiff's due process claim.

■ With respect to Plaintiff's general argument that the Center Director's bias was constitutionally intolerable, I note that it is an open question whether federal employee discipline, short of discharge, is a matter of constitutional dimension. *See Gilbert v. Homar*, 520 U.S. 924, 928–29, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) ("Although we have previously held that public employees who can be discharged only for cause ... cannot be fired without due process, we have not had occasion to decide whether the protections of the Due Process Clause extend to discipline of ten-

ured public employees short of termination.") (citation omitted). Assuming that it is,[7] the question presented is whether Plaintiff received "a fair trial in a fair tribunal," *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955), for "[n]ot only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'" *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) (quoting *In re Murchison*, 349 U.S. at 136, 75 S.Ct. 623).

The general issue presented in this case was considered by the Supreme Court in *Withrow*. The Court observed that parties advancing due process arguments based on the bias of the decision maker bear a considerable burden:

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

*Id.* at 47, 95 S.Ct. 1456. I am not persuaded that Plaintiff meets this burden. To begin, as the head of the Department's local office, the Center Director was, as a matter of basic managerial reality, in a position that required him to not only oversee Lyons's EEO complaint to ensure that a safe work environment was maintained, but also to preside over employee discipline. This basic reality is most evident from the fact that the disciplinary process, although separate and distinct from the EEO process, essentially grew out of the EEO process. However, it does not appear that an adverse employment measure was a foregone conclusion even under these circumstances. Plaintiff was permitted, pursuant to Department regulations, to argue his case before the Center Director both orally and in writing. Furthermore, the notice of suspension reveals that the Center Director imposed a seven-day suspension rather than the fourteen-day suspension proposed on account of Plaintiff's "exemplary service to the Agency over the course of [his] career." This considerable leniency tends to refute the existence of bias on the Center Director's part. Under the circumstances presented in this case, I conclude that the Center Director was not so biased against Plaintiff that he did not receive a fair hearing.

■■■ Of course, the foregoing discussion ignores entirely the fact that Plaintiff presented his case to an impartial grievance examiner in a three-day, full evidentiary hearing. Thus, even if the Center Director had been biased against him, it is hard to understand how the subsequent grievance hearing, with additional review by the Department's Regional Director, did not provide him with even more process than he was due. *See Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ("The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."); *Arnett v. Kennedy*, 416 U.S. 134, 151–55 & n. 21, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (plurality opinion) (holding that due process clause was not violated when "trial-type" hearing on issue of cause was afforded to civil servant after he was discharged because adequate process was given prior to dis-

---

7. That Pathak has a property interest protecting him from arbitrary suspension is not contested by the Department.

**150**

charge). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Unless an agency's personnel policies provide for a full evidentiary hearing prior to discharge or discipline, tenured employees do not have a right to a full evidentiary hearing prior to a discharge or other adverse employment measures. *See Loudermill,* 470 U.S. at 546, 105 S.Ct. 1487. Yet, that is precisely the sort of process Plaintiff received in this case. The Department's disciplinary proceedings complied with the Department's personnel policy and provided Plaintiff with procedural safeguards in excess of the requirements of the Due Process Clause, *i.e.,* an informal hearing followed by a full evidentiary hearing. Plaintiff's complaint, which focuses almost exclusively on the Center Director's alleged bias, ignores the well reasoned conclusions of the admittedly unbiased grievance examiner. Pathak does not suggest that the Center Director's bias resulted in any distortion of the facts; indeed, he admits most of the factual recitations. His argument is that the Center Director's legal conclusions and resulting disciplinary actions were the arbitrary and capricious result of his bias. However, the impartial grievance examiner came to the same conclusion after a full evidentiary hearing. The due process claim is groundless.

### Conclusion

Because the facts found by the Center Director were sufficient to permit a reasonable person to conclude that Plaintiff had sexually harassed Lyons, Plaintiff's appeal regarding Count I is DENIED and the Department's motion for summary judgment on Count I is GRANTED. Because Plaintiff has abandoned his equal protection claim, the Department's motion for summary judgment on Count II is GRANTED. Because the Department afforded Plaintiff with all the process he was due under the circumstances, the Depart-

ment's motion for summary judgment on Count III is likewise GRANTED.

*So Ordered.*