[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-13552
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 4, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 00-00042-CV-RLH-1

IRVING LINDSEY,

Plaintiff-Appellant,

versus

JO ANNE B. BARNHART,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(January 4, 2006)

Before TJOFLAT, ANDERSON and HULL, Circuit Judges.

PER CURIAM:

Irving Lindsey, through counsel, appeals the district court's judgment

affirming the Commissioner's denial of his application for disability insurance benefits, pursuant to 42 U.S.C. § 405(g), and supplemental security income, pursuant to 42 U.S.C. § 1382(c)(3). After review, we affirm.

## I. BACKGROUND

Because the validity of the issues raised by Lindsey depends, in part, on the medical evidence in the record, we first review his medical history. After reviewing Lindsey's medical history, we discuss the Administrative Law Judge's ("ALJ") decision.

A.    Lindsey's Application and Testimony

In his application for social security benefits, Lindsey alleged that, as of May 1, 1998, he was disabled due to injuries to his back, neck, and left shoulder suffered during a 1992 accident at work.[1] After his injury, Lindsey claimed he could not work because of the pain associated with his injuries.[2]

Specifically, Lindsey testified that his accident required shoulder surgery and that the injury to his left shoulder still prevented him from having the strength to grab and hold. Lindsey further claimed that his back hurts him every day and often "goes out without reason." The injury also prevents him from sitting or

---

[1]While Lindsey was walking on some scaffolding, the scaffolding broke and he fell onto a pile of iron.

[2]At the time of his hearing, Lindsey was 61 years old, had an eighth grade education, and had worked in the sheet metal business.

standing for extended periods of time.

Lindsey used a walker for two weeks in 2001 and tries not to lift anything anymore because he does not want to have to use a walker again.

At the administrative hearing, Lindsey testified that he continues to have pain in his lower back, neck, and left shoulder. Lindsey further stated that he occasionally takes his grandson fishing and that he drives to the store to buy tobacco, milk, and other items. Lindsey also testified that he walks to and from the mailbox and is able to feed his chickens daily. Although Lindsey used to hunt regularly, it has been a few years since he last hunted.

B.    Medical History From Treating Physicians

On July 24, 1992, shortly after his fall at work, Dr. Rembert McLendon examined Lindsey. Lindsey complained of lower back pain and stiffness after sitting. Dr. McLendon noted that Lindsey was able to walk on his toes and heels, had good segmental motion, and could bend over so that his fingertips were only a foot from the floor.

On August 3, 1992, Dr. McLendon again examined Lindsey, who complained of having problems sleeping because of back pain and having difficulty standing erect after sitting. Additionally, Lindsey complained of pain in his neck, left hip, left arm, and left thigh.

Dr. McLendon noted that Lindsey was able to forward flex within six inches of touching the floor and had good segmental motion. Lindsey stated he had pain with forward flexion and hyper-extension. Dr. McLendon observed that Lindsey walked with a normal gait and could walk on his toes and heels. Furthermore, Lindsey could touch overhead and behind his neck and back.

In August of 1992, Dr. Stephen Spain examined Lindsey and determined that Lindsey had mild lumbar tenderness, lumbar strain, and decreased pain in left leg. On August 18, 1992, Dr. Spain noted that Lindsey felt better, but still had increased back pain.

Later in August of 1992, Dr. William D. Lowery, a neurologist, examined Lindsey, who complained of tenderness in his entire spine and pain in his left shoulder and arm. Dr. Lowery noted that there was no evidence of muscle atrophy or weakness. A MRI of Lindsey's cervical and lumbar spine revealed no significant findings other than some mild degenerative changes. Dr. Lowery recommended against surgery and suggested physical therapy.

On September 24, 1992, Dr. Lowery examined Lindsey again. Dr. Lowery noted that Lindsey was somewhat better, but still had lower back pain, and pain over the coccyx and in the left shoulder.

On September 29, 1992, Lindsey began to see Dr. Lamar H. Moree, an

4

anesthesiologist. After conducting some range-of-motion tests, Dr. Moree gave Lindsey two epidural steroid injections.

In October 1992, Dr. Moree again examined Lindsey. Lindsey reported that his pain had decreased, and Dr. Moree gave Lindsey additional injections. Later that month, Lindsey reported that he continued to have pain in his lower back, and he had difficulty walking long distances. Dr. Moree prescribed oral drug therapy for the pain.

In November 1992, Dr. Moree again examined Lindsey. Lindsey reported that his pain had moderated some, but he still had lower back pain. Dr. Moree noted that Lindsey was making progress, but it was slow and gradual.

On November 10, 1992, Lindsey returned to Dr. Lowery, who noted that Lindsey was doing better. According to Dr. Lowery, Lindsey was neurologically normal. Dr. Lowery dismissed Lindsey from his care because there was nothing further he could do for Lindsey.

Later in November 1992, Lindsey returned to Dr. Moree and reported that his pain had moderated some. Dr. Moree concluded that Lindsey was improving, but should continue with the oral drug therapy.

In December, Dr. Moree placed Lindsey in TENS unit therapy. According to the record, TENS unit therapy is a form of physical therapy.

5

On December 29, 1992, Lindsey reported to Dr. Moree that the pain in his lower back had moderated some from TENS unit therapy. Dr. Moree noted that there was gradual progress and continued TENS unit therapy.

In January 1993, Lindsey reported to Dr. Moree that he had received significant benefits from TENS unit therapy. Lindsey stated he still had left shoulder pain, but the neck and back had improved significantly. Dr. Moree recommended that Lindsey continue with TENS unit therapy.

On February 9, 1993, Lindsey reported to Dr. Moree that his neck and back were improved from TENS unit therapy, but he still had pain in his left shoulder. Dr. Moree subsequently administered steroid injections in Lindsey's left shoulder.

On February 23, 1993, Lindsey informed Dr. Moree that the injection in his left shoulder only gave him partial relief and he still had pain there. However, Lindsey reported that his back and neck pain had significantly improved. Dr. Moree continued to prescribed oral drug therapy.

In March 1993, Dr. Moree noted that Lindsey was making progress but still reported pain in his left shoulder.

In April 1993, Dr. Champ Baker, an orthopedic surgeon, examined Lindsey. According to Dr. Baker, Lindsey suffered from a rotator cuff tear in his left shoulder. After a subsequent MRI, Dr. Baker recommended surgery.

6

On June 14, 1993, Lindsey had surgery on his shoulder. According to Dr. Thomas N. Bernard, Lindsey had normal behavior, posture, and gait after the surgery. Although Lindsey had tenderness where he had surgery, he had a full range of motion in his lumbar spine. Dr. Bernard recommended light exercise for Lindsey's spine along with rehabilitation of his shoulder.

On August 25, 1993, Lindsey returned to Dr. Bernard and complained that his left shoulder was "frozen." Dr. Bernard recommended aggressive rehabilitation for neck and back but did not think Lindsey had a surgical problem. Dr. Bernard further recommended light support of Lindsey's lumbar spine and continuing with as much activity as possible.

Dr. Bernard concluded that Lindsey had improved as much as he was going to with regard to his cervical and lumbar spine problems. Dr. Bernard determined that, disregarding the shoulder problem, Lindsey could function in a medium job profile with no repetitive bending, stooping, or squatting with a 50-pound weight limit.

Lindsey had follow-up visits on September 27, December 6, and December 10, 1993, at a clinic. During his visits, Lindsey was examined by either Dr. Baker or Dr. Bernard. Both doctors noted that Lindsey was improving but still had pain. For the rest of 1993, Lindsey continued with physical therapy.

After receiving a report from Lindsey's physical therapist, Dr. Bernard concluded that Lindsey had a weight limitation that placed him in the light to medium job profile range.

On July 5, 1994, Lindsey underwent a residual functional capacity ("RFC") assessment with Dr. Samuel Wright. Dr. Wright concluded that Lindsey could occasionally lift or carry 50 pounds, he could frequently lift or carry 25 pounds, he could stand or sit six hours in an eight-hour day, and he was unlimited in pushing and pulling. For postural limitations, Lindsey could frequently balance, kneel, and crouch, and occasionally could climb, stoop, and crawl. For manipulative limitations, Lindsey was limited in overhead reaching with the left arm.

On August 26, 1994, Dr. Kenneth Burkus, an orthopedic surgeon, found that Lindsey was neurologically intact without focal deficits. Dr. Burkus, noting that Lindsey still complained of lower back pain and neck pain, determined that Lindsey could return to work on August 26, 1994, with limitations documented in the above RFC assessment. According to Dr. Burkus, Lindsey would hopefully be released from all limitations in six months.

Six months later, on February 21, 1995, Dr. Burkus gave Lindsey another neurological exam and found Lindsey was neurologically intact without focal deficits and had a normal gait. Dr. Burkus concluded that Lindsey could return to

work without restrictions and that Lindsey's permanent partial disability rating was zero percent.

Despite Dr. Burkus' recommendations, Lindsey did not return to work. Rather, on July 7, 1996, another RFC assessment was performed, this time by Dr. Ronald Lohman. Dr. Lohman concluded that Lindsey could occasionally lift 50 pounds, frequently lift or carry 25 pounds, stand or sit for a total of six hours in an eight-hour day, and push and pull were unlimited. As for postural limitations, Lindsey could frequently climb stairs, balance, stoop, kneel, and crouch; occasionally crawl; and never climb scaffolds.

In July 1997, Dr. Spain completed a form concerning Lindsey's ability to work. In contrast to his earlier examinations of Lindsey, Dr. Spain concluded that Lindsey, in an eight-hour work day, could sit for no hours, stand for no hours, and walk for no hours. Dr. Spain stated that Lindsey could occasionally lift up to ten pounds but never lift anything heavier than ten pounds, and could occasionally carry up to five pounds but never carry anything over five pounds. Also, Dr. Spain stated that Lindsey could not use his left hand for pushing or pulling arm controls or for fine manipulation, and could not use his left foot for pushing or pulling leg controls. Lindsey could "not at all" bend, squat, crawl, climb, or reach; had "total restriction" for unprotected heights, being around moving machinery, exposure to

marked changes in temperature, and exposure to dust, fumes, and gases; and had only "moderate restriction" for driving automotive equipment. Dr. Spain concluded that Lindsey had permanent total disability due to coronary artery disease, lumbar disk disease, and osteoarthritis.

On March 13, 2000, Dr. Rotimi Samuel examined Lindsey. Dr. Samuel found that Lindsey described a history of multiple joint aches without any significant objective findings or limiting range of motion. Dr. Samuel stated that Lindsey should be able to function independently, strongly doubted there was any limitation of range of motion in left shoulder, and thought Lindsey gave active resistance on evaluations of his left shoulder.

On May 7, 2000, Dr. Lina Caldwell conducted yet another RFC assessment. Dr. Caldwell concluded that Lindsey could occasional lift 50 pounds, could frequently lift 25 pounds, could stand and or walk six hours a day, sit for six hours a day, and had unlimited pushing and pulling. The only postural limitations for Lindsey were that he could never work on a scaffold, and he had limited overhead reaching in the left upper extremity. Dr. Caldwell stated that the exam failed to support Lindsey's claim that he could not lift or turn his neck.[3]

_____

[3]There was another RFC assessment on August 30, 2000, by a medical consultant with an illegible name. In this assessment, the consultant concluded Lindsey had no exertional limitations, no postural limitations, and no manipulative limitations. For symptoms, the consultant stated that Lindsey did not seek care for his problems, and that greater weight needed to be given to the lack of objective evidence to support his symptoms.

C.    The ALJ's Decision

Before we discuss the ALJ's decision in this case, we outline generally the five-step process the ALJ must follow in reviewing an application for social security benefits.  Under the circumstances of this case, an ALJ must evaluate Lindsey's claim with respect to the following five criteria, as set forth in 20 C.F.R. § 404.1520:

1.    Is Lindsey performing substantial gainful activity?

2.    Does Lindsey have a severe impairment?

3.    Does Lindsey have a severe impairment that meets or equals a listed impairment?

4.    Can Lindsey perform his past relevant work?

5.    Based on Lindsey's age, education, and work experience, can Lindsey perform other work of the sort found in the national economy?

In this case, the ALJ followed the five step process.  As for the first step, the ALJ concluded that Lindsey "had not engaged in substantial gainful activity since July 10, 1992."

As for the second step, the ALJ concluded that Lindsey suffered from "a history of left rotator cuff tear[] and degenerative disc disease."  The ALJ further determined that these were "severe" impairments.

As for the third step, the ALJ compared Lindsey's impairments to the listed impairments.   Although the list is too voluminous to recite here, the purpose of the

11

listings is to "streamline[] the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background." Bowen v. Yuckert, 482 U.S. 137, 153, 107 S. Ct. 2287, 2297 (1987). The ALJ concluded that Lindsey's impairments did not meet or equal any of the listed impairments.

As for the fourth step, the ALJ concluded that Lindsey "was unable to perform his past relevant work as a sheet metal mechanic." As for Lindsey's RFC, the ALJ found that Lindsey's "capacity for the full range of medium work was diminished by his inability to perform tasks requiring overhead reaching." In determining Lindsey's RFC, the ALJ determined that Lindsey's "statements concerning his impairments and their impact on his ability to work on the date his insured status expired are not entirely credible."

At step five, the ALJ called a vocational expert ("VE") to testify as to Lindsey's ability to make the necessary adjustments to other work. The VE opined that someone with Lindsey's RFC could work as a hospital janitor, palletizer operator, companion, gate guard, and front end load operator, of which there were 1,000, 2,500, 20,000, 1,000, and 1,800 positions, respectively, in the Georgia/north Florida economy. The ALJ then found that Lindsey was not disabled because there was work in the national economy that he could perform.

12

The district court affirmed the ALJ's decision, and Lindsey now appeals to this Court.[4]

## II. DISCUSSION

On appeal, Lindsey argues that the ALJ improperly determined his RFC and that the ALJ improperly penalized him for not amending his alleged onset date.[5] We disagree and conclude that substantial evidence supports the ALJ's decision in this case.[6]

A.    Lindsey's RFC

---

[4]"Our review in a Social Security case is the same as that of the district court." Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996) (citing Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)). "We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner]." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). Rather, we must defer to the Commissioner's decision if it is supported by substantial evidence. Id. "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Id. (citing Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971)) (other citations omitted). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Miles, 84 F.3d at 1400 (citing Martin, 894 F.2d at 1529).

[5]On appeal, Lindsey also argues that the ALJ improperly determined the skill level of his past, relevant work. Specifically, Lindsey argues that his specific vocational preparation ("SVP") should have been two, not seven as determined by the ALJ. Although Lindsey testified that his previous work was unskilled and, thus, should have been assigned an SVP of two, there were independent assessments that Lindsey's previous work was skilled and had an SVP of seven. These included a worker's compensation claim settlement signed by Lindsey and his lawyer, as well as 1994, 1996, and 2000 vocational assessments by state consultants. Consequently, we readily conclude that substantial evidence supports the ALJ's determination that Lindsey's previous work was skilled and had an SVP of seven.

[6]Lindsey also argues that the district court failed to analyze properly the ALJ's decision. However, we do not address this argument because we review the ALJ's finding, not the district court's decision. See Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).

To determine the physical exertion requirements of work in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. See 20 C.F.R. § 404.1567. On appeal, Lindsey argues that the evidence does not support the ALJ's determination that he had an RFC to perform medium work.[7] Rather, Lindsey asserts that he is limited to light work.[8]

In his brief on appeal before this Court, Lindsey claims that the ALJ should have placed greater emphasis on Dr. Bernard's assessment of his condition. However, Dr. Bernard's report explicitly stated that the RFC assessment gave Lindsey a weight limitation that placed him "in the light to medium job profile range." Specifically, Dr. Bernard's report stated that Lindsey could occasionally lift up to 36 pounds and frequently carry up to 23 pounds. Dr. Bernard's conclusions regarding Lindsey's RFC are consistent with the definition of medium

---

[7]Medium work involves "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

[8]Light work involves
lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.
20 C.F.R. § 404.1567(b).

work in the regulations.  See 20 C.F.R. § 404.1567(c) (defining medium work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds").  Furthermore, there were several RFC assessments that concluded Lindsey had the ability to perform medium work as defined by the regulations.

Given all the medical evidence in the record, we readily conclude that the ALJ's determination that Lindsey had an RFC to perform medium work is supported by substantial evidence.[9]

B.    Lindsey's Alleged Onset Date

During Lindsey's administrative hearing the ALJ commented that he would be willing to rule in Lindsey's favor if Lindsey was willing to amend the onset date of his disability.  Specifically, the ALJ stated:

> That the comment is made from the perspective of a softhearted Judge

---

[9]In fact, the only medical evidence in the record that would have supported a determination that Lindsey's RFC should be limited to light work was Dr. Spain's 1997 report. The opinion of a treating physician, such as Dr. Spain, "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) (citation omitted).  This Court has concluded "good cause" exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. Id.  When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons. Id.  In this case, the ALJ found "Dr. Spain's assessment greatly lacking in support based on the medical records.  His own records include no support for his conclusions . . . ."  The ALJ therefore rejected Dr. Spain's assessment of Lindsey's RFC.  We conclude that the ALJ's rejection of Dr. Spain's assessment is supported by substantial evidence.

15

that maybe would like to give Mr. Lindsey something here. But I am completely open-minded as to where this goes if we have to – if I have to write a decision. . . . And as I set [sic] here now in view of what I see, I would be agreeable to issuing a fully favorable decision with amending the onset date at age 60. I'm certainly not requiring anything.

On appeal, Lindsey asserts that the ALJ denied his application for social security benefits because he refused to change the onset date of his alleged disability.

Lindsey is entitled to a fair hearing that comports with due process. See Withrow v. Larkin, 421 U.S. 35, 46, 95 S. Ct. 1456, 1464 (1975). Obviously, it would be improper for the ALJ to refuse to award Lindsey social security benefits based on Lindsey's refusal to amend his onset date. However, we do not read the ALJ's comments as creating any fundamental due process concerns that would warrant remanding this case for another administrative hearing.

Rather, the ALJ simply stated that it believed that Lindsey had made a sufficient showing of a disability as of the age of 60. Although it was arguably improper for the ALJ to make such an offer, nothing in the record suggests that the ALJ held Lindsey's refusal to amend his onset date against him. Instead, the ALJ repeatedly stated that it had an open mind as to the merits of Lindsey's claim.

In short, we conclude that Lindsey's administrative hearing complied with due process and that the ALJ corrected any impression of bias via its repeated statements that it had an open mind as to the merits of Lindsey's claim. See Diorio

16

v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (determining that the ALJ's discussion of irrelevant factors was harmless because the ALJ applied the proper factors in the end); Isom v. Schweiker, 711 F.2d 88, 90 (8th Cir. 1983) (permitting the ALJ to correct any potential bias associated with negative comments by conducting a fair and impartial hearing).

For all the above reasons, we affirm the ALJ's denial of Lindsey's application for social security benefits.

AFFIRMED.