IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 21, 2012 Session

# EDWARD LEE CARRUTH  v. CITY OF ETOWAH

Appeal from the Chancery Court for McMinn County
No. 2010-CV-461      Jerri S. Bryant, Chancellor

No. E2011-02502-COA-R3-CV - Filed July 25, 2012

The City of Etowah appeals a decision of the trial court leaving in place an injunction prohibiting the City from demolishing a house owned by the plaintiff, Edward Lee Carruth. The City's Building Inspector, on behalf of the City, directed that the house be demolished. He acted pursuant to a city ordinance governing the clearing of unsafe structures.  Carruth filed a complaint seeking (1) judicial review of the administrative ruling or, in the alternative, (2) review by writ of certiorari.  The trial court issued the writ and entered a temporary restraining order prohibiting the City from demolishing or otherwise destroying the house. Following a bench trial, the court found that (1) there was inadequate proof to sustain the City's action; (2)  Carruth did not receive a hearing from the City prior to the City's action; (3) the City failed to make findings of fact, as required by statute, in support of its decision; and (4) the cost of repairing the house was less than fifty percent of its value.  The City challenges each of the trial court's determinations and it further challenges the trial court's conduct of a hearing on a common-law writ of certiorari.  Finding no reversible error, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Emily A. Cleveland,  Knoxville, Tennessee, for the appellant, City of Etowah.

Randy G. Rogers, Athens, Tennessee, for the appellee, Edward Lee Carruth.

**OPINION**

I.

The plaintiff, who resides in Knoxville, is the owner of the house at issue, a 1930s-built rental property located at 517 Athens Pike in the city of Etowah.  On August 24, 2010, the City's Building Inspector, David W. Mason, sent Carruth a letter regarding his house:

> Re: Violation of Section 13, "Property Maintenance Regulations", 13-209 <u>Slum Clearance</u>, Basis for a Finding of Unfitness, of the Etowah City Code.
>
> Mr. Carruth,
>
> This is to notify you of [sic] the property at 517 Athens Pike, Etowah, TN has been inspected and the structure is deemed unfit for occupancy.  Conditions exist at said property that renders [sic] it unfit, unsafe and dangerous.  The use of the structure for human occupancy or use is prohibited and unlawful.  The building is a hazard for fire, accident or calamity.  It is dilapidated and in disrepair.
>
> It is our finding that this building is beyond repair at reasonable expense and therefore needs to be demolished.  The building is unsafe and dangerous or detrimental to the health, safety, and welfare of the community residents.
>
> I will meet with you at 2:00 pm on 10 September, 2010 in my office to allow you the right to answer this complaint.

The letter contained one enclosure which provides as follows:

> Items of Concern: Ed Carruth house
>
> 1. Inadequate if any insulation.
> 2. Substandard plumbing.
> 3. Water damage to subfloor and floor joist.
> 4. Damaged and rotting wood on exterior surfaces.
> 5. Damage and movement in foundation.
> 6. Damaged and substandard windows.
> 7. Substandard electrical system.
> 8. No source of heat.

9. Single entrance and exit.
10. Evidence of mold.

In a September 3, 2010, reply, Carruth advised Mr. Mason that he had been to the house to mow the yard and remove items left behind by a long-time tenant who had left without notice. Carruth stated that he "was unaware of the property being as bad as [he] found it," and that he would be "glad to talk . . . about the property." Because Carruth was scheduled to be out of state, the meeting was rescheduled. He met the following month with Mr. Mason at the latter's office.[1] No transcript or statement of the evidence reciting details of the meeting was prepared.

On November 15, 2010, the City Attorney sent Carruth a "Final Notice" advising him that the house must be removed or demolished within thirty days as it was "unfit for human occupancy or use." The letter further states as follows:

> This determination has been made pursuant to [Tenn. Code Ann.] § 13-21-103 and Etowah Municipal Code Title 13 §205.
>
> The Public Officer for [the City] has determinated that repair, alteration, or improvement of the structure cannot be made at a reasonable cost in relation to the value of the structure.
>
> You have been given notice of this determination in a letter dated August 24, 2010. You have also been given the opportunity to appear at a hearing with the Public Officer to answer the complaint filed against you.

On December 17, 2010, Carruth filed suit in the trial court seeking an injunction and "requesting review of the actions and positions taken by [the City] regarding the structure." Carruth essentially disputed the City's determination that the house was unsafe and that repair costs would be unreasonable in relation to the house's value. In particular, Carruth asserted that "the City has not produced any estimate for the cost of repairs that the City maintains should be made. . . ." Carruth further alleged that his October 2010 meeting with the Building Inspector did not satisfy the requirements of due process. Carruth requested that the trial court determine "the true facts," and "issue appropriate decrees and orders preserving [his] right to own, utilize, maintain and have the benefits of his property." In the alternative, Carruth requested issuance of a writ of certiorari to enable "review and

---

[1]The exact date of the meeting is not referenced, but it is undisputed that it took place sometime in the month of October.

consideration by this Court as to whether the City's action is legal, constitutional, supported by the facts and appropriate. . . ."

After the complaint was filed, and on the same day, the court issued a temporary injunction prohibiting the City from acting in furtherance of its condemnation order; the court also issued a writ of certiorari commanding the City to "gather and prepare all records" relating to the house for the court's review. In an attempt to comply with the writ, the City filed a record consisting of: (1) the Building Inspector's August 24, 2010, Notice of Unfitness and photographs of the house taken by him on that date; (2) Carruth's responsive letter; (3) the City's November 15, 2010, "Final Notice;" (4) the most recent tax assessment listing the value of the house, excluding land, at $7,400; (5) a copy of the City's "Slum Clearance" Ordinance; and (6) a December 2, 2010, letter from the City Attorney to Carruth's counsel reiterating the City's determination that the house must be removed or demolished "because repair, alteration, or improvement of the structure cannot be made at a reasonable cost in relation to the value of the structure" – defined under the ordinance as "that which does not exceed fifty (50%) of the value of the structure."

In answer to the complaint, the City generally asserted that it acted appropriately pursuant to its slum clearance ordinance and that its decision was supported by substantial and material evidence. In responding to Carruth's denial of due process claim, the City "admit[ted] only that its Building Inspector . . . met with [Carruth] to discuss the property," and denied that he was deprived of due process.

On August 2, 2011, the parties appeared for a hearing before the trial court. The court heard from two witnesses – Carruth and the Building Inspector. Carruth testified to the condition of the house at the time of the inspection. He conceded that with the unexpected departure of his long-time tenant, garbage and miscellaneous items were left behind and it looked like a "trash dump." He further admitted that the bathtub, toilet, and fixtures were filthy, which he attributed to someone urinating in them when water service was not active.

Carruth presented photographs depicting the house after the garbage was removed, and after he cleaned and made repairs, all occurring since the citation was issued. This mainly included painting, inside and out, and repair or replacement of boards, broken window panes, a single floor joist, missing outlet covers, loose mortar in the brick along the foundation, and pieces of damaged or missing sheetrock. In addition, Carruth had removed old carpet and sanded and sealed the wood floors. Carruth testified, with supporting receipts, that the total cost of labor and materials for the repairs was $1,000. According to Carruth, he stopped further work on the house when Mr. Mason said he would not allow the house to be fixed. Carruth agreed that he still needed to rebuild steps off of the back porch that the tenant had torn down. Carruth refuted the charges of "substandard" plumbing and electrical

systems; he stated that the house was tied into the city water/sewer system, it had a "modern" meter feed that supplied it with electricity, and neither system had experienced any problems. He further noted, concerning the charge that there was no heat source, that he had provided 220 plugs and two heating units, which the tenant had taken, along with the stove and refrigerator, when she left. Carruth, the owner of some thirteen rental units, estimated that the house alone was worth roughly $20,000. Carruth said that during the October 2010 meeting, the Building Inspector refused to discuss any necessary repairs, and simply advised Carruth that none would be allowed. According to Carruth, Mr. Mason told him that he was condemning both Carruth's house and the one next door and if Carruth refused to tear his down, he, Mr. Mason, would "doze it down" and bill him.

For its part, the City, through the Building Inspector, presented photographs of the house taken at the time of the August 24 visit, and the Building Inspector testified to the areas of concern he felt they depicted. As to their October 2010 meeting, the Building Inspector testified as follows:

Counsel: And what did you do after you notified Mr. Carruth?

Building Inspector: I set up an appointment with him.

\* \* \*

Counsel: Where was the hearing held?

Building Inspector: In my office.

\* \* \*

Counsel: Who else was present during the hearing?

Building Inspector: Just Mr. Carruth and I.

\* \* \*

Counsel: What did you and Mr. Carruth talk about during the October 2010 hearing?

Building Inspector: I showed him the - - the photographs of the structure and what my concerns were, and we agreed to disagree to a point and decided we'd go to the house and look at the

-5-

things and - - at which point, after going through each and every item, we agreed to disagree and that he said he'd sue, and I said, "We'll see you in court."

On cross-examination, the Building Inspector further testified:

Counsel: On the particular day of the hearing you had with [Carruth], did he discuss with you the estimated cost of repairing these particular deficiencies you had pointed out or mentioned in your letter?

Building Inspector: We did not discuss specific numbers. We discussed approximations on percentages.

Counsel: Did you ever acquire from any expert with any significant or specific qualifications any estimate on repairing any deficiencies which you identified in the home?

Building Inspector: No, sir.

In its final order, the trial court found as follows:

There was no adequate proof to sustain the actions of the City. . . .
[Carruth] did not receive a hearing from the City . . . prior to the City's actions in ordering that [Carruth's] structure be demolished.
The City . . . failed to make findings of fact as required under the Slum Clearance statute and found at Tenn. Code Ann. § 13-21-101 et seq.
The cost of repairs to [Carruth's] structure are less than fifty percent of the value of the structure.
The restraining order against the City . . . should remain in place, and the City . . . is ordered not to take any further action against [Carruth] preventing him from occupying the premises, getting utilities for the premises, and otherwise utilizing the property. . . .

The City timely filed a notice of appeal.

II.

The City presents issues for our review that we restate as follows:

> 1. The trial court erred when it held there was not adequate proof to sustain the actions of the City of Etowah.
>
> 2. The trial court erred when it held that [Carruth] did not receive a hearing from the City prior to the City's actions in ordering that [Carruth's] structure be demolished.
>
> 3. The trial court erred when it held that the City failed to make findings of fact as required pursuant to Tenn. Code Ann. § 13-21-101 et seq.
>
> 4. The trial court erred when it held that the cost of the repairs to [Carruth's] structure were less than fifty percent of the value of the structure.
>
> 5. The trial court erred when it held that the restraining order entered against the City should remain in place.

III.

Our review is de novo upon the record of the proceedings below; however, that record comes to us with a presumption that the trial judge's factual findings are correct. Tenn. R. App. P. 13(d). We must honor this presumption unless we find that the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984). Our de novo review of the trial court's conclusions on matters of law, however, is undertaken with no presumption of correctness. *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005). We review the trial court's application of law to the facts de novo, again with no presumption of correctness. *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005) (citation omitted).

IV.

Relevant portions of the City's "Slum Clearance" Ordinance[2], are as follows:

---

[2]The ordinance was promulgated pursuant to the enabling legislation set forth in Tenn. Code Ann. § 13-21-101, et seq. (2011), and the ordinance's provisions are essentially taken verbatim from relevant provisions of the statute.

13-203. "Public officer" designated; powers. There is hereby designated and appointed a "public officer," to be the building inspector of the city, to exercise the powers prescribed by this chapter. . . .

13-204. Initiation of proceedings; hearings. Whenever a petition is filed with the public officer . . . or whenever it appears to the public officer (on his own motion) that any structure is unfit for human occupation or use, the public officer shall, if his preliminary investigation discloses a basis for such charges, issue and cause to be served upon the owner of, . . . such structure a complaint stating the charges in that respect and containing a notice that a hearing will be held before the public officer (or his designated agent) at a place therein fixed, not less than ten (10) days nor more than thirty (30) days after the service of the complaint; and the owner . . .shall have the right to file an answer to the complaint and to appear in person, or otherwise, and give testimony at that time and place fixed in the complaint; and the rules of evidence prevailing in courts of law or equity shall not be controlling in hearings before the public officer.

13-205. Order to owners of unfit structures. If, after such notice and hearing as provided for in the preceding section, the public officer determines that the structure under consideration is unfit for human occupancy or use, he shall state in writing his finding of fact in support of such determination and shall issue and cause to be served upon the owner thereof an order: (1) if the repair, alteration or improvement of the structure can be made at a reasonable cost in relation to the value of the structure (not exceeding fifty percent [50%] of the reasonable value), requiring the owner, during the time specified in the order, to repair, alter, or improve such structure to render it fit for human occupancy or use or to vacate and close the structure for human occupancy or use; or (2) if the repair, alteration or improvement of said structure cannot be made at a reasonable cost in relation to the value of the structure (not to exceed fifty percent [50%] of the value of the premises), requiring the owner within the time specified in the order, to remove or demolish the structure.

13-209. <u>Basis for a finding of unfitness</u>. The public officer . ... shall have the power and may determine that a structure is unfit for human occupancy and use if he finds that conditions exist in such structure which are dangerous or injurious to the health, safety or morals of the occupants or users of such structure, the occupants or users of neighboring structures or other residents of the City of Etowah; such conditions may include the following (without limiting the generality of the foregoing): defects therein increasing the hazards of fire, accident, or other calamities; lack of adequate ventilation, light, or sanitary facilities; dilapidation; disrepair; structural defects; and uncleanliness.

13-211. <u>Enjoining enforcement of orders</u>. Any person affected by an order issued by the public officer served pursuant to this chapter may file a suit in chancery court for an injunction restraining the public officer from carrying out the provisions of the order, and the court may, upon the filing of such suit, issue a temporary injunction restraining the public officer pending the final disposition of the cause. . . .

The remedy provided herein shall be the exclusive remedy and no person affected by an order of the public officer shall be entitled to recover any damages for action taken pursuant to any order of the public officer, or because of noncompliance by such person with any order of the public officer.

(Underlining in original.)

V.

A.

Although framed as several issues, the thrust of the City's appeal is that the trial court, by and through its various factual findings and conclusions, erred when it ruled that the temporary restraining order should remain in place, thereby preventing the City from carrying out its condemnation order.

At the outset, however, we find it necessary to address the somewhat unconventional process in the trial court. As we have noted, the trial court first issued a writ of certiorari for

the purpose of reviewing the City's actions. A "writ of certiorari is an order from a superior court to an inferior tribunal to send up a complete record for review, so that the court can determine whether that tribunal has exceeded its jurisdiction, or has acted illegally, fraudulently or arbitrarily." **Yokley v. State**, 632 S.W.2d 123, 126 (Tenn. Ct. App. 1981). "The statutory scheme implementing common law certiorari 'plainly presupposes that a judicial or quasi-judicial proceeding is the subject of review and that a 'record' of evidence, common in such proceedings, is available for certification to the reviewing court.' " **Bernard v. Metro. Gov't of Nashville & Davidson County**, 237 S.W.3d 658, 664 (Tenn. Ct. App. 2007)(quoting **Fallin v. Knox County Bd. of Comm'rs**, 656 S.W.2d 338, 341 (Tenn.1983)).

Were this a case where the writ was employed as contemplated, the trial court's review generally would have been confined to the "record" and limited accordingly. "Generally speaking, review of an administrative decision by way of the common law writ is confined to the question of whether the inferior board or tribunal has exceeded its jurisdiction or acted illegally, arbitrarily, capriciously, or fraudulently." **Harless v. City of Kingsport**, No. 03A01-9707-CH-00289, 1998 WL 131519 at *4 (Tenn. Ct. App. E.S., filed Mar. 25, 1998) (citing Tenn. Code Ann. § 27-8-101 (Supp.1997); **McCallen v. City of Memphis,** 786 S.W.2d 633, 638 (Tenn.1990)). Such review "typically involves a determination of whether the record contains material evidence to support the decision below." **Id**. (citing **Hoover v. Metropolitan Bd. of Housing Appeals**, 936 S.W.2d 950, 954 (Tenn. App.1996); **Hall v. Shelby County Retirement Bd.**, 922 S.W.2d 543, 545 (Tenn.App.1995)).

It is readily apparent to us that the review contemplated by the writ was not possible in the present case because of a complete lack of proceedings at the administrative level. Faced with little more than Mr. Mason's photographs and conclusory "findings," the trial court essentially took on an expanded role and conducted a full evidentiary hearing of the cause without objection from either party. In fact, it was the City's counsel who suggested the need for the trial court to hear testimony from both parties. During opening remarks, the following exchange took place:

> Counsel for City: Your Honor, we're here today based on the City's decision to condemn Mr. Carruth's property under the city slum ordinance.

> *     *     *

> Because this was filed as a writ of certiorari, we did file an administrative record with the court as well. The administrative

record contains . . .eight or seven exhibits that includes all the correspondence that went between the parties.

It also includes the photographs that the . . . building inspector . . . took of the property during his inspection, and . . . all notices that were issued to Mr. Carruth prior to the City issuing its final notice.

The Court: But there's not a verbatim transcript?

Counsel: No, your Honor, there's not a verbatim transcript - - which, ordinarily, under writ of certiorari - -

The Court: I just read the transcript, look at the evidence, and move on. That's right - -

Counsel: Exactly.

The Court: - - isn't it? This is a different posture today.

Counsel: That's why I believe there may be some witnesses that need to present testimony, and I'm not objecting to witness testimony.

In our view, the full hearing of the cause in the trial court was implicitly consented to by both parties and in fact prompted by the City. As a result, the City cannot now be heard to object to the manner in which the hearing was conducted at the trial level. It is a well established rule that a party in the appellate court will not be permitted or heard to assume a position contrary to and inconsistent with the position he took in the trial court. *Estate of Schultz v. Munford, Inc*., 650 S.W.2d 37, 40 (Tenn. Ct. App. 1982); *Daniels v. Combustion Engineering, Inc*., 583 S.W.2d 768, 770 (Tenn.App. 1979); *Clement v. Nichols*, 186 Tenn. 235, 237, 209 SW2d 23, 24 (Tenn. 1948). Tenn. R. App. P. Rule 36(a), providing for the relief available on appellate review, is also applicable here. The Rule provides, in relevant part, as follows:

The Supreme Court, Court of Appeals, and Court of Criminal Appeals shall grant the relief on the law and facts to which the party is entitled or the proceeding otherwise requires. . . . Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take

-11-

whatever action was reasonably available to prevent or nullify the harmful effect of an error.

As the comment elaborates, the Rule "is a statement of the accepted principle that a party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error." Simply put, the City encouraged and the trial court accepted an expanded role that allowed her to conduct a full bench trial of Carruth's suit against the City. To the extent that the City now seeks to argue that the trial court erred in failing to limit its role to review under the common-law writ of certiorari, we reject the City's position.

B.

At the conclusion of the hearing, the chancellor issued the following bench ruling:

> Number one, [Carruth] alleges that there really wasn't a due process hearing, and I tend to agree with [him], that I don't know that that was really a due process hearing.
>
> There certainly wasn't a hearing. There was the same person who made the allegations doing the hearing, which I think is a problem. And I have no findings of fact that are required under the statute for the hearing officer to put down to review, so that is a failure of some evidence there for me to rule and review their findings. There's no proof of what was done at a hearing.
>
> There's no proof of whether there was any attempted admission of monetary values at the hearing or not. There certainly was today, without objection, and there certainly – even if I found that the things that needed to be done were injurious to the health and safety of the occupant or dangerous, we don't have anything other than [Carruth's] proof today about the cost of those involved, and they certainly are less than the amount required under the ordinance, which is 50 percent.
>
> So based on all of that, the Court finds that there is not adequate proof to sustain the actions of the City of Etowah in this case and keeps the restraining order in effect.

-12-

At this juncture, we think it is appropriate to address the trial court's stated discomfort with the fact that under Section 13-204 of the slum clearance ordinance, the Building Inspector also serves as the City's administrative hearing officer. Standing alone, the fact that investigative and judicial functions are placed in the same public official does not equate to a denial of or even raise due process concerns. In ***Harless v. City of Kingsport***, we rejected precisely such a challenge to an administrative ruling. Therein, this Court observed:

> Nevertheless, with regard to the propriety of an administrative official acting in dual capacities, the Supreme Court has stated that the mere fact that both investigative and adjudicative functions have been granted to an administrative body… does not of itself create an unconstitutional risk of bias in an administrative adjudication. In reaching this conclusion, the Supreme Court relied – as do both parties in the instant case – on the decision of the United States Supreme Court in ***Withrow v. Larkin***, 421 U.S. 35, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975). In that decision, the United States Supreme Court stated that the contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a… difficult burden of persuasion to carry. ***Id***., 95 S. Ct. at 1464. The Court also observed that the case law, both federal and state, generally rejects the idea that the combination [of] judging [and] investigating functions is a denial of due process….***Id***., 95 S. Ct. at 1467.

1998 WL 131519 at *5-6.

C.

In summary, it is very clear to us that, assuming there was an administrative hearing of the type and nature of the one contemplated by the City's ordinance, there was no record preserved of that hearing. In fact, we doubt very seriously that what took place in front of Mr. Mason can be accurately characterized as an administrative "hearing." Under the unusual circumstances presented, the trial court, with the consent of the parties, conducted a full bench trial of the case as opposed to a limited hearing pursuant to the common-law writ of certiorari. Accordingly, our customary standard of review of the trial court's factual findings and conclusions of law applies. In this regard, we conclude that the trial court did not err in finding that the City did not provide Carruth with a hearing before ordering that his

-13-

house be demolished. We further conclude that the City failed to make required findings of fact in support of its decision.

## VI.

We are left to consider the two issues at the heart of the City's appeal. First, the City contends that the trial court erred when it determined there was "not adequate proof" to sustain the City's order to demolish the house. In a related issue, the City challenges the chancellor's finding that "the cost of repairs to the . . . structure are less than fifty percent of the value of the structure." The City notes that the ordinance does not require it to produce an estimate of the repair costs. It submits that the Building Inspector's photographs and list of "concerns" constitute sufficient "proof of the necessity of . . . repairs" and substantial and material evidence in support of its condemnation order. We cannot agree.

The entire basis for the City's order directing that Carruth's house be demolished or removed was the Building Inspector's determination under Section 13-205 of the Ordinance that "repair, alteration, or improvement of the structure cannot be made at a reasonable cost in relation to the value of the structure," that is, at a cost "not to exceed fifty percent [50%] of the value of the premises." At trial, the City presented the most recent tax assessment, showing the value of the house alone to be $7,400. In his testimony, Carruth estimated the house was worth roughly $20,000. The only proof of the cost of repairs was further testimony of Carruth indicating that he had removed garbage, cleaned, and made necessary repairs at a total cost of $1,000, including labor and materials. Even accepting the City's value of the house at $7,400, Carruth would have had up to half that amount – $3,700 – to expend before reaching the limit at which repairs would not have been permitted. Considering the evidence, the trial court observed that "we don't have anything other than [Carruth's] proof today about the cost of [necessary repairs] involved, and they certainly are less than the amount required under the ordinance, which is 50 percent [of the value of the structure]." On this proof, the trial court found that there was inadequate evidence to sustain the City's decision.

On our considered review of the entire record, the evidence does not preponderate against the trial court's finding that the threshold amount at which removal or destruction of the house was mandatory was not reached. Accordingly, the trial court did not err in holding that the restraining order against the City should remain in place.

## VII.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, the City of Etowah. This case is remanded to the trial court, pursuant to applicable law, for

-14-

collection of costs assessed below and such enforcement proceedings regarding the court's injunction, if any, as may be required.

_____
CHARLES D. SUSANO, JR., JUDGE